UNITED STATES of America,
Plaintiff-Appellee,

v.

Kathryn Frances **HAND**, Defendant-
Appellant.

No. 73–1949.

United States Court of Appeals,
Fifth Circuit.

July 26, 1974.

Rehearing En Banc Granted Sept. 16, 1974.

———◆———

Morton L. Susman, Mark Perrin, Thomas M. Roberson, Houston, Tex., for defendant-appellant.

Anthony J. P. Farris, U. S. Atty., Robert Darden, U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before COLEMAN, AINSWORTH and GEE, Circuit Judges.

GEE, Circuit Judge:

Kathryn Frances Hand appeals from her conviction on a jury verdict of ten counts of embezzlement from her employer, a federally insured credit union. Her appeal presents, with others, contentions of unreasonable search and seizure, of deficiencies in the indictment and variances in proof, and of a constitutionally inadequate defense provided by her retained trial counsel.

Mrs. Hand was the bookkeeper and office manager of ILA 1351 Federal Credit Union (the Union), operating in Houston, Texas. According to her testimony, she discovered a serious shortage of cash in the Union accounts about 2½ years before the events which led to her indictment, a shortage which steadily increased over the ensuing time to many thousands of dollars. She was in effective control of the Union's accounting operations. Mrs. Hand admitted having concealed the increasing shortage from the federal credit union examiners over the course of several annual audits, but asserted that she had no idea where the funds were going. The technique which she employed in this scheme was that known in accountancy as "lapping," which involves using later cash receipts to match earlier deposits and relying on posting delay to bridge the gap between what should have been in the coffers and what was. Though her case presents troubling questions on two points, we affirm.

### I.

*The Search and Seizure Contention*

Appellant Hand had placed within purses many cash-received vouchers which evidenced her scheme for concealing the credit union's shortage. These purses were located in or on file cabinets and desks in the Union's office. At a time when the focus of suspicion had begun to center strongly on Mrs. Hand, she told the federal examiner that she was sending someone by to pick up these purses, and perhaps other personal property. On receiving this word, he opened the purses—to ascertain whether or not they were hers, so he testified [1]—and discovered the incriminating vouchers.

Assuming that Hale was the sort of person to whose searches and seizures the Fourth Amendment applies, his search of the handbags in these circumstances raises close questions. Before us, the United States seeks to justify it under the "plain view" exception to warrant requirements, contending that Hale blundered upon the evidence in the course of an innocent attempt to find identification. This was, indeed, his testimony, and the trial court considered and rejected a motion to suppress after hearing it. It thus might seem the court credited Hale's explanation, an in limine fact-finding which we would be reluctant to overturn on a cold record.[2] On the other hand, the basis of the court's ruling is not clear: the record indicates that the government urged that Hale was merely a private citizen, to whose searches Fourth Amendment safeguards did not apply, while the defense memorandum on the subject sought to negative consent as a warrant exception. The court merely overruled the defense motion to suppress, without elaboration. In these circumstances, where we are unable to determine with assurance whether the court made the fact-finding—innocent stumbling upon the evidence—upon which the plain view exception must rest, we must proceed

---

1. An assertion somewhat dubious at first blush, since they were women's handbags, and the only other female who worked in the office appears to have been present when he opened them.

2. See McCormick, Evidence § 53 at 121 (2d Ed. 1972) :

"Accordingly, under the traditional view and the generally accepted principle the trial judge decides with finality those preliminary questions of fact upon which depends the admissibility of an item of evidence that is objected to under an exclusionary rule. . . ."

further.[3] To do so requires consideration of the facts leading up to the search.

When Hale, the federal examiner, arrived in early April, 1971, to make his annual examination of the Union, he was aware from three previous examinations that the Union had had a continuing problem with the handling of cash. He considered Mrs. Hand to be the one who "ran" the Union. Almost immediately, he discovered a thirty-dollar cash shortage related to a particular cash voucher. In the course of the audit, other ominous signs appeared. Interest income appeared too small for the volume of loans. About $22,000 in unreported delinquent loans surfaced. Upon inquiry of Mrs. Hand, she produced—after a day's delay—extension agreements covering the delinquent loans, but four of these bore signatures which Hale felt, and advised Mrs. Hand, appeared suspicious. A check with one of the supposed signatories produced a receipt showing his loan had not been extended at all, but paid. At this point, Hale advised the Union's board of the situation, suggesting suspension of Mrs. Hand and a thorough investigation and verification of all accounts. On April 8, she was suspended.

The next day, April 9, Hale was informed by the other female employee of the Union, Mrs. Westergreen, that Mrs. Hand had telephoned about some missing ledger cards. Hale called Mrs. Hand, and she told him the names of various members whose ledger cards had, she said, mysteriously appeared that morning on her front porch. Hale and the credit union president went to her home that same day and received from her ledger cards corresponding to the names she had given over the telephone, most of which were torn across and which Hale recalled taping back together. Upon Hale's return to the Union office, he received yet another call from Mrs. Hand, one in which she confessed that a shortage of funds had been going on at the Union for two-and-a-half years, that during this period she had been concealing the shortage, and that though she did not know where the funds had gone she was willing to make some amount of restitution.

Against this background, Mrs. Hand also told Hale, either in the exchange in which she confessed cooking the books or in her third telephone call to him that day, that she was sending for some of her purses which were in the Union office, as well as some books and scarves. In the process of gathering up her property, Hale testified, he opened the purses, looking for credit cards or for other identification of them as Mrs. Hand's. He found identifying matter. He also found over 150 vouchers minuting cash transactions in tens of thousands of dollars, the very great majority of which were initialed by Mrs. Hand as the receiving person. Assuming the worst, that a deliberate, warrantless search of the purses was carried out at this point by Hale, does it pass Fourth Amendment muster?

We conclude that it does. By the time Hale learned of Mrs. Hand's immediate purpose to remove her handbags from the office, she had admitted juggling the Union's accounts; and numerous of its financial records had appeared at her home, under highly suspicious circumstances and in a condition indicating an aborted effort to destroy them. Probable cause existed to believe that she had previously concealed and removed and might again conceal or remove records, and the purses were a likely vehicle for either action. Hale would have been remiss in his duty had he permitted such containers to be abstracted from the proximity of the accounting files without determining that they were not being so used.

It may be that in these circumstances, even absent Mrs. Hand's notice that she was sending for the purses, Hale would

---

3. Though it seems likely, that, had the court felt Hale was testifying disingenuously, other consequences would have ensued.

have been authorized by the Union's consent to examine the contents of such containers as he found in and about the files. The record indicates that purses were either in or on the file cabinets or desks in the office, and it does not indicate that Mrs. Hand had use of these furnishings to the exclusion of other employees, rather the contrary.[4] And though personal handbags imply privacy, the fact that numbers of them were left about the office while she was elsewhere places these in a position little more personal, if at all, than that which would have been held by a closed folder found in the files and marked, say, "K. F. Hand—Personal." At any rate, he received Mrs. Hand's call stating her purpose to remove the purses while present in a place where he was authorized to be and to most of which he had an unquestioned right of access.

But when to these is added the exigency of Mrs. Hand's stated purpose to send for the purses, the scale is decisively tipped. On the record, Hale's choices at this juncture were to release the purses unexamined, to refuse to release them while he contacted regular law enforcement authorities and a warrant issued, or to inspect their contents and be guided by what he found. Probable cause existing, the first course would have been a dereliction of duty. As to the latter two, if Hale's official "investigative" position was such as to subject him to Fourth Amendment strictures, it was perforce such as to authorize his seizure and immobilizing of the purses. Having the power to seize, in the situation presented, he had the duty to do so. And having seized, the lesser intrusion

was to check the purses for Union documents and, if none were found, to release them without more ado. Chambers v. Maroney, 399 U.S. 42, 51–52, 90 S.Ct. 1975, 1981–1982, 26 L.Ed.2d 419, 428 (1970); United States v. Soriano, 497 F.2d 147 (5th Cir., en banc, 1974) [No. 72–1520, July 15, 1974, slip op. 5783].

It is true that the facts of *Chambers* and *Soriano* differ from these and from each other, and true moreover that Mrs. Hand was not under arrest[5] and her handbags did not contain, and were not thought to contain, contraband or dangerous instrumentalities. But they were easily movable, and she had announced a positive and immediate intent to remove them. There was probable cause to believe that they contained evidence, and the opportunity to preserve it was fleeting. In the totality of these circumstances, we conclude that the reasoning of *Chambers* transcends its factual setting sufficiently to justify the search. And we have held in Carlton v. Estelle[6] that warrantless search of a parked car for "mere evidence" was justified by the presence of persons presumably sympathetic to Carlton who might have made away with it. Here the suspect herself had avowed an immediate intent to have the movable and suspect articles removed. In these circumstances, the seizure and search were permissible.

II.

*The Indictment: Was Jurisdiction Alleged and Proved?*

Appellant also raises in various modes and points what may be seen either as a deficiency in the indictment, a variance between the accusation and the proof, or

---

4. This circumstance, with the highly specific nature of the probable cause here present to believe Mrs. Hand might have concealed her employer's property for her own purposes, tends to distinguish the case at bar from United States v. Blok, 88 U.S.App.D.C. 326, 188 F.2d 1019 (1951), in which an employer's consent was held ineffective to validate search for evidence of an extraneous crime of a desk reserved for an employee's exclusive use. There the Court noted: "Her superiors could not reasonably search the desk

for her purse . . . or anything else that did not belong to the government [her employer] and had no connection with the work of the office." 188 F.2d at 1021. Here, though Mrs. Hand's purse was searched, it was precisely such matter which, with probable cause, was sought.

5. Though probable cause to arrest her doubtless existed at the time of the search.

6. 480 F.2d 759 (5th Cir. 1973).

a failure of proof. The indictment contained ten counts. Each, except for dates and amounts, was identical to the others. Count I will therefore serve to illustrate all of them:

## COUNT I

That on or about the 25th day of July, 1968, in the Houston Division of the Southern District of Texas, and within the jurisdiction of this Court, one KATHRYN FRANCES HAND, being an employee of the ILA 1351, Federal Credit Union, Houston, Texas, the deposits of which Credit Union were then and there insured by the National Credit Union Administration, did knowingly and with intent to injure and defraud the said ILA 1351, Federal Credit Union at Houston, Texas, embezzle certain monies of the said Credit Union, which had therefore been entrusted to the care and custody of the said KATHRYN FRANCES HAND by reason of her position as an employee of said Credit Union, in the amount of One Thousand One Hundred Ninety Four and 94/100 ($1,194.94) Dollars, more or less.

(Violation: Title 18, United States Code, Section 657)

It is undisputed that the United States offered no proof that the deposits of the Union were insured in the manner charged in the indictment or, indeed, in any manner.[7] Moreover, 18 U.S.C. § 657 did not include embezzling from an insured institution as an offense before it was amended to do so, effective October 19, 1970. The first six counts of the indictment charge offenses committed before that date, and thus—insofar as they merely charge embezzlement from an insured institution—charge what was not made a crime by 18 U.S.C. § 657 or by any other law at the time of

the asserted offense. The question of the existence vel non of insurance was not submitted to the jury as an element of the offense charged,[8] and appellant contends that consequently the jury failed to find a crucial and jurisdictional element of the alleged crimes. As to the accusation of having embezzled from a federally insured institution, appellant is entirely correct: it was neither proved nor found.

It remains to consider whether this admitted variance between pleading and proof was fatal. We also consider whether the indictment sufficiently charges as well the commission of the crime of embezzling from a federally *chartered* credit union and, if so, whether the conviction may properly be affirmed on this ground.[9]

The indictment is clearly susceptible of being read as charging that Mrs. Hand's offense was committed against an entity which (1) was a federal credit union and (2) the deposits of which were federally insured. It is also susceptible of being read as referring to an entity which merely incorporated the phrase "Federal Credit Union" in its title. Competent pleading of this jurisdictional ground would at the least have added some such phrase as, "a federal credit union" after what was arguably merely a title. Had this been done, the allegation of this ground of jurisdiction would have been clearly sufficient. United States v. McAdams.[10] This careless omission, together with the utter failure of proof as to the other ground of jurisdiction alleged, remits us to a brief consideration of first principles which should have had no place whatever in this case. These may be simply stated, the difficulty is in their application.

Common-law ruffles and flourishes form no part of the current law of

7. For all the record shows they well may not have been.

8. Though the statute, elided to refer only to insured institutions, was read as an earlier part of the court's charge.

9. At all pertinent times § 657 denounced this as a crime. United States v. McCarthy, 196 F.2d 616 (7th Cir. 1952); United States v. McAdams, 303 F.Supp. 824 (N.D.W.Va. 1969).

10. *Id.*

criminal pleading. An indictment is sufficient which plainly asserts the essential facts of the offense.[11] The purpose of the indictment is said to be to inform the accused of the charge against him sufficiently for him to prepare his defense, to protect him after conviction or acquittal against further prosecution for the same cause, and to inform the court of the facts charged so that, if necessary, it may pass on their legal sufficiency to support a conviction.[12] Surplusage, though subject to being stricken on defendant's motion, does not vitiate an indictment.[13]

 As noted above, each count of Mrs. Hand's indictment alleges that, while employed by " . . . ILA 1351, Federal Credit Union, Houston, Texas, the deposits of which Credit Union were then and there insured by the National Credit Union Administration. . . ." she made away with funds entrusted to her. The United States entirely failed to prove the alleged insurance, but proved the Union was a federal one, chartered under the laws of the United States, beyond peradventure. If the indictment's reference to insurance be regarded as surplusage, and if its reference to ILA 1351, Federal Credit Union, is a sufficient allegation of federal incorporation, then the government has alleged two jurisdictional bases, either of which would do, and proved one of them. "Federal Credit Union" is a term of art[14] analogous to "National Bank" and similar titles. And so, stated most favorably to Mrs. Hand, the decision under this head of appeal comes down to this: as a matter of criminal

pleading, was jurisdiction sufficiently alleged, against objection made for the first time on appeal, by the simple assertion that defendant embezzled from "the X National Bank" or "the Y Federal Credit Union." Not without difficulty, we conclude that it was.

There can be little doubt that the major purposes of an indictment were served by this one. Mrs. Hand was charged with embezzling specified sums from her named employer, for whom the record shows she had worked about five years before being suspended. Here is no question such as might have been presented had she worked for two or three with similar names, or picked several pockets in one day; she well knew what she was accused of. This was fair notice to her under the Sixth Amendment. And it is equally plain that, in the event of conviction or acquittal, the pleading—supplemented if necessary by the record of all proceedings against her[15]—would suffice to protect her from further jeopardy. It is with Fed. R.Crim.P. 7(c)[16] and its demand for " . . . a plain, concise and definite written statement of the essential facts constituting the offense charged. . . . ." that we come to the rub.

 A skimpier assertion of jurisdiction can scarcely be imagined than we find here. The element is, moreover, one which can in no sense be waived or cured by verdict, being of the type whose absence is available for consideration even on motion in arrest of judgment.[17] Yet the modern rule for treatment of indictments is that they are to be read as a whole and interpret-

11. Fed.R.Crim.P. 7(c).

12. 1 Wright, Federal Practice and Procedure: Criminal § 125.

13. Fed.R.Crim.P. 7(d); see 1 Wright, Federal Practice and Procedure: Criminal § 127.

14. Defined at 12 U.S.C. § 1752 as a cooperative association organized under that chapter, which is, in turn, entitled the "Federal Credit Union Act." 12 U.S.C. § 1751.

15. Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); Woodring

v. United States, 376 F.2d 619 (10th Cir. 1967).

16. And with the third function of the indictment, to "set out the specific offense," Russell v. United States, 369 U.S. at 768, 82 S. Ct. at 1049, 8 L.Ed.2d at 253, so as "to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction . . . ." United States v. Cruikshank, 92 U.S. 542, 558, 23 L.Ed. 588, 593 (1875).

17. Fed.R.Crim.P. 34.

ed in a common-sense manner, free of the trammels devised by the common law at a time when every felony was punishable by death,[18] and the rule is not otherwise as to essential elements of the pleading. Such a reading indicates that an entity styled a "Federal Credit Union" is at least very likely to be a federal credit union, whether or not realleged to be such in lower case. Nor need there be fear in this case, such as was expressed in Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), that the grand jury which returned this indictment did not mean to charge the offense of which Mrs. Hand was convicted. No prejudice to the substantial rights of Mrs. Hand appears from the sketchiness of the pleading, and hence it was not fatally defective. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Indeed, it is far from certain that an entire failure to allege the federal character of the association would have been fatal, where a proper head of jurisdiction was alleged and another was proved without objection to the evidence as variant, and without motion for judgment of acquittal, motion in arrest of judgment, or other outcry below. Cf. Jackson v. United States, 123 U.S.App.D.C. 276, 359 F.2d 260 (1966).[19] In these circumstances the indictment, though a good example of bad practice, did not mislead or prejudice Mrs. Hand and was sufficient.

### III.
*Inadequacy of Trial Counsel and Other Matters*

Appellate counsel for Mrs. Hand faults retained trial counsel by hindsight for failing to take various steps in the course of the proceedings below. A catalogue of things which might have been done and were not is presented. Though we are not in the business of rating legal performance,[20] we have considered counsel's supposed deficiencies, severally and in total effect, in relation to the record and are entirely unable to say that the charge is well grounded. Nothing is advanced which may not be viewed either as a legitimate tactical choice, the relinquishment of an untenable position or, at worst, an honest mistake. We take occasion to reiterate both that we do not view such roundings on trial counsel with favor and that there is a wide expanse of tolerance for ability of counsel between success in the case and an inadequacy so extreme and so clear as to offend the Constitution.

We have carefully considered appellant's remaining points, as well as those which we have discussed. None requires reversal.

Affirmed.

### ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, RONEY and GEE, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc.

It is ordered that the cause shall be reheard by the Court en banc on briefs without oral argument. The Clerk shall set a briefing schedule for the filing of supplemental briefs.

18. 6 Moore, Federal Practice ¶ 7.04.

19. If more be needed, defendant's requested jury instructions inquired merely whether

Mrs. Hand was the employee of ILA 1351, Federal Credit Union.

20. Horsley v. Simpson, 400 F.2d 708 (5th Cir. 1968).