**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Kathryn Frances HAND,**
**Defendant-Appellant.**

No. 73–1949.

United States Court of Appeals,
Fifth Circuit.

July 28, 1975.

Rehearing Denied Sept. 26, 1975.

Morton L. Susman, Mark W. Perrin, Thomas M. Roberson, Houston, Tex., for defendant-appellant.

Anthony J. P. Farris, U. S. Atty., Robert Darden, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, RONEY and GEE, Circuit Judges.

GEE, Circuit Judge: *

Kathryn Frances Hand was convicted by a jury of ten counts of embezzlement from her employer, a federally insured credit union. Her appeal presents, with others, contentions of unreasonable search and seizure, of deficiencies in the indictment and variances in proof, and of an inadequate defense by retained trial counsel.

Mrs. Hand was the bookkeeper and office manager of ILA 1351 Federal Credit Union (the Union), operating in Houston, Texas. About 2½ years before the events which led to her indictment, she testified, she discovered a serious shortage of cash in the Union accounts, a shortage which steadily increased over the ensuing time to many thousands of dollars. In effective control of the Union's accounting operations, she admitted having concealed the growing shortage from federal examiners over the course of several annual audits, but maintained that she had no idea where the funds were going. The technique she used to hide the shortage is known in accountancy as "lapping": using later cash receipts to match earlier deposits and relying on posting delay to bridge the gap between what should have been in the coffers and what was. We affirm her conviction.

I.

*The Search and Seizure Contention*

Appellant Hand had concealed in several purses many cash-received vouchers evidencing her scheme for concealing the credit union's shortage. These purses were located in or on file cabinets and desks in the Union's office. At the exact moment, or very shortly after, she had given Hale, the federal examiner, probable cause to think her the thief, she advised him that she was sending by for these purses. On receiving this word, he opened the purses—to ascertain whether or not they were hers, he testified [1]—and discovered the incriminating vouchers.

Assuming that Hale was the sort of person to whose searches and seizures the Fourth Amendment applies, his search of the handbags in these circumstances, however natural and reasonable, raises close questions. Before us, the United States seeks to justify it under the "plain view" exception to warrant requirements, contending that Hale blundered upon the evidence in the course of an innocent attempt to find identification. This was, indeed, his testimony, and the trial court considered and rejected a motion to suppress after

---

* The subject and author being the same as in the panel opinion, 497 F.2d 929 (5th Cir. 1974), considerable portions of that opinion appear here, without quotation marks or further attribution.

1. An assertion somewhat dubious at first blush, since they were women's handbags, and the only other female who worked in the office appears to have been present when he opened them.

hearing it. It thus might seem the court credited Hale's explanation, an in limine fact-finding which we would be reluctant to overturn on a cold record.[2] On the other hand, the basis of the court's ruling is not clear: the record indicates the government urged that Hale was merely a private citizen, to whose searches Fourth Amendment safeguards did not apply, while the defense memorandum on the subject sought to negative consent as a warrant exception. The court merely overruled the defense motion to suppress, without elaboration. In these circumstances, where we are unable to determine with assurance whether the court made the fact-finding—innocent stumbling upon the evidence—upon which the plain view exception must rest, we must proceed further.[3] To do so requires consideration of the facts leading up to the search.

When Hale arrived in early April, 1971, to make his annual examination of the Union, he was aware from three previous examinations of its continuing problem with the handling of cash. He considered Mrs. Hand to be the one who "ran" the Union. Early on, he discovered a thirty-dollar cash shortage related to a particular cash voucher. In the course of the audit, other ominous signs appeared. Interest income appeared too small for the volume of loans. About $22,000 in unreported delinquent loans surfaced. Upon inquiry of Mrs. Hand, she produced—after a day's delay—extension agreements covering the delinquent loans, but four of these bore signatures which Hale felt, and advised Mrs. Hand, appeared suspicious. A check with one of the supposed signatories produced a receipt showing his loan had not been extended at all, but paid. At this point, Hale advised the Union's board of the situation, suggesting suspension of Mrs. Hand and a thorough investigation and verification of all accounts. On April 8, she was suspended.

The next day, April 9, Hale was informed by the other female employee of the Union, Mrs. Westergreen, that Mrs. Hand had telephoned about some missing ledger cards. Hale called Mrs. Hand, and she told him the names of various members whose ledger cards had, she said, mysteriously appeared that morning on her front porch. Hale and the credit union president went to her home that same day and received from her ledger cards corresponding to the names she had given over the telephone, most of which were torn across and which Hale recalled taping back together. Upon Hale's return to the Union office, Mrs. Hand called again and confessed that a shortage of funds had been going on at the Union for two-and-a-half years, that during this period she had been concealing the shortage, and that though she did not know where the funds had gone she was willing to make some amount of restitution.[4]

At about the same time, Mrs. Hand also told Hale, either in this call or in a third call to him that day, that she was sending for some of her purses which were in the Union office, as well as some books and scarves. In the process of gathering up her property, Hale testified, he opened the purses, looking for credit cards or for other identification of them as Mrs. Hand's. This he found. He also found over 150 vouchers minuting cash transactions in tens of thousands of dollars, most of which were initialed by Mrs. Hand as the receiving teller. Assuming the worst, that a deliberate, warrantless search of the purses was carried out at this point by Hale, does it pass Fourth Amendment muster?

 We conclude that it does. By the time Hale learned of Mrs. Hand's immediate purpose to remove her handbags

2. See McCormick, Evidence § 53 at 121 (2d Ed. 1972): "Accordingly, under the traditional view and the generally accepted principle the trial judge decides with finality those preliminary questions of fact upon which depends the admissibility of an item of evidence that is objected to under an exclusionary rule. . . ."

3. Though it seems likely that, had the court felt Hale was testifying disingenuously, other consequences would have ensued.

4. Which revelations certainly amount to probable cause.

from the office, she had admitted juggling the Union's accounts; and numerous of its financial records had appeared at her home, under highly suspicious circumstances and in a condition indicating an aborted effort to destroy them. Probable cause existed to believe that she had previously concealed and removed and might again conceal or remove records, and the purses were a likely vehicle for either action. Hale would have been remiss in his duty had he permitted such containers and their contents to be taken away from the accounting files without determining that they were not being so used.

It may be that in these circumstances, even absent Mrs. Hand's notice that she was sending for the purses, Hale would have been authorized by the Union's consent to examine the contents of whatever containers he found in and about the files. The record indicates that purses were either in or on the file cabinets or desks in the office, and it does not indicate that Mrs. Hand had use of these furnishings to the exclusion of other employees, rather the contrary.[5] And though personal handbags imply privacy, the fact that numbers of them were left about the office while she was elsewhere places these in a position little more personal, if at all, than that which would have been held by a closed folder found in the files and marked, say, "K. F. Hand-Personal." At any rate, he received Mrs. Hand's call stating her purpose to remove the purses while present in a place where he was authorized to be and to most of which he had an unquestioned right of access.

But when to these is added the exigency of Mrs. Hand's stated purpose to send for the purses, the scale is decisively tipped. Hale's choices at this juncture were to release the purses unexamined, to refuse to release them while he contacted regular law enforcement authorities and a warrant issued, or to inspect their contents and be guided by what he found. Probable cause existing, the first course would have been a dereliction of duty. As to the latter two, if Hale's official "investigative" position was such as to subject him to Fourth Amendment strictures, it was perforce such as to authorize his seizure and immobilizing of the purses. Having the power to seize, in the situation presented, he had the duty to do so. And having seized, the lesser intrusion was to check the purses for Union documents and, if none were found, to release them without more ado. Chambers v. Maroney, 399 U.S. 42, 51–52, 90 S.Ct. 1975, 1981–1982, 26 L.Ed.2d 419, 428 (1970); United States v. Soriano, 497 F.2d 147 (5th Cir., en banc, 1974).

It is true that the facts of *Chambers* and *Soriano* differ from these and from each other, and true moreover that Mrs. Hand was not under arrest[6] and her handbags did not contain, and were not thought to contain, contraband or dangerous instrumentalities. But they were easily movable, and she had announced a positive and immediate intent to remove them. There was probable cause to believe that they contained evidence, and the opportunity to preserve it was fleeting. The probable cause, moreover, had arisen suddenly and as a result of unforeseeable circumstances—Mrs. Hand's abrupt confession to cooking the books. Thus the exact requirements for application of *Chambers* set out by Mr. Justice White were complied with:

**5.** This circumstance, with the highly specific nature of the probable cause here present to believe Mrs. Hand might have concealed her employer's property for her own purposes, tends to distinguish the case at bar from United States v. Blok, 88 U.S.App.D.C. 326, 188 F.2d 1019 (1951), in which an employer's consent was held ineffective to validate search for evidence of an extraneous crime of a desk reserved for an employee's exclusive use. There the Court noted: "Her superiors could not reasonably search the desk for her purse . . . or anything else that did not belong to the government [her employer] and had no connection with the work of the office." 188 F.2d at 1021. Here, though Mrs. Hand's purse was searched, it was precisely such matter which, with probable cause, was sought.

**6.** Though probable cause to arrest her doubtless existed at the time of the search.

". . . the circumstances that furnish probable cause to search a particular auto for particular articles are most often unforeseeable; moreover, the opportunity to search is fleeting since a car is readily movable. *Where this is true*, as in *Carroll* [Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543] and the case before us now, if an effective search is to be made at any time, either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant for whatever period is necessary to obtain a warrant for the search.

. . . . .

Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion is permissible until the magistrate authorizes the 'greater.' But which is the 'greater' and which the 'lesser' intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment."

Chambers v. Maroney, 399 U.S., at 50–2, 90 S.Ct., at 1981, 26 L.Ed.2d, at 428 (emphasis added).

7. 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

8. 403 U.S., at 463, 91 S.Ct., at 2036, 29 L.Ed.2d, at 581.

9. 480 F.2d 759 (5th Cir.), cert. denied, 414 U.S. 1043, 94 S.Ct. 546, 38 L.Ed.2d 334 (1973).

10. It has been suggested that our recent decisions in one form of baggage-search case— United States v. Garay, 477 F.2d 1306 (5th Cir. 1973); United States v. Lonabaugh, 494 F.2d 1257 (5th Cir. 1973); United States v. Anderson, 500 F.2d 1311 (5th Cir. 1974)—are opposed to our conclusions in this case. But these cases are factually quite different from ours. In each of them our panel saw the de-

It is, of course, true that on its facts *Chambers* is an "automobile" case. But then Erie R.R. Co. v. Tompkins[7] is, in the same sense, a "railroad" case, Harry Tompkins having been there presented with lasting fame and a tort suit by a passing freight. At least two of our sister circuits read *Chambers* as broadly applicable whenever probable cause is sudden and the chance to search fleeting. United States v. Mehciz, 437 F.2d 145 (9th Cir.), cert. denied, 402 U.S. 974, 91 S.Ct. 1663, 29 L.Ed.2d 139 (1971); United States v. Evans, 481 F.2d 990 (9th Cir. 1973); United States v. Johnson, 467 F.2d 630 (2d Cir. 1972), cert. denied, 413 U.S. 920, 93 S.Ct. 3069, 37 L.Ed.2d 1042 (1973). And a majority of the Supreme Court has refused to join in later language characterizing *Chambers* as limited in force to automobiles, it being often overlooked that the passage in Coolidge v. New Hampshire[8] which sought to do so was joined in by only four Justices.

In the totality of circumstances presented by this case, we therefore conclude that the reasoning of *Chambers* transcends its factual setting sufficiently to justify the search. And we have held in Carlton v. Estelle[9] that a warrantless search of a parked car for "mere evidence" was justified by the presence of persons presumably sympathetic to Carlton who might have made away with it. Here the suspect herself had avowed an immediate intent to have the movable and suspect articles removed, and it well appeared there might be another or other unknown persons with an interest in tampering with them. The seizure and search of the handbags were permissible.[10]

fendant, with his known confederates, if any, as sufficiently immobilized by an arrest or restraint amounting to de facto arrest, and the baggage to be searched under sufficient control of the police, that no factors excusing failure to apply to the magistrate existed. In the case at bar Mrs. Hand and, if she were believed, the unknown thief were both at large with means of access to the office where the handbags were, so that by no means short of carrying the handbags to the magistrate's office with him could Hale have secured them while obtaining a search warrant. How much more reasonable to check one quickly for contraband!

## II.

### *The Indictment: Was Jurisdiction Alleged and Proved?*

We adopt Part II of the panel opinion,[11] headed as above, as the opinion of the Court on the sufficiency of the indictment. We emphasize that we hold no more than that this indictment withstands an objection made for the first time on appeal, where it is apparent that Mrs. Hand's substantial rights were not affected. *Cf.* United States v. Eaton, 501 F.2d 77 (5th Cir. 1974).

## III.

### *Inadequacy of Trial Counsel and Other Matters.*

We likewise adopt Part III of the panel opinion, adding only that since our intervening en banc decision in Fitzgerald v. Estelle, 505 F.2d 1334 (5th Cir. 1974), it is yet more evident that Hand's assistance from her retained counsel was not inadequate.

Affirmed.

DYER, Circuit Judge, with whom WISDOM, THORNBERRY, GOLDBERG, SIMPSON and LEWIS R. MORGAN, Circuit Judges, join, dissenting as to Part I:

On April 8, 1971, Mrs. Hand was suspended and relieved of her duties as bookkeeper and office manager of the Union and departed. On the following day she telephoned Hale, the federal examiner, from her home to talk about the shortage of funds and to tell him of her willingness to make restitution. During this conversation Mrs. Hand told Hale that she would send someone to the Union's office to pick up her personal belongings, some books, scarves, and two purses. In gathering up her property for delivery to Mrs. Hand's messenger, Hale made a deliberate, warrantless search of the purses and found incriminating evidence in them.

I find it passing strange that exigent circumstances, the foundation used by the majority to approve the search of the purses, was not urged in the district court, is never mentioned in the record, was not argued or relied upon by the Government in its original briefs, and makes its appearance for the first time in the panel opinion. The majority, upon finding probable cause for the search, adds to it "the exigency of Mrs. Hand's stated purpose to send for the purses," and concludes that "the scale is decisively tipped."

A "stated purpose" to send for her purses is hardly an exigent, pressing, critical or urgent circumstance upon which to premise a parallelism with automobile search cases. Hale had the purses in his sole and exclusive possession and was under no contraint to deliver them to Mrs. Hand's messenger or anyone else before obtaining a search warrant. To apply the word "exigent" to this situation is to say "when *I* use a word, . . . it means just what I choose it to mean—neither more nor less."[1]

---

These decisions can, indeed, be extended to conflict in principle with *Chambers'* holding that if one has the right to seize, he has the right to search; but it does not appear that this aspect of *Chambers* was argued to our panels in those cases or any attempt made to analyze the police actions taken in them along greater-intrusion, lesser-intrusion lines. What the result of such an analysis would have been, we cannot say, but we need not disturb these authorities to decide this case, the factor of secure control by the authorities of the item to be searched being present in each of them, but absent here. *Chambers* may therefore properly be applied here without necessarily extending it to the situations which they present. Time enough when another such as this is presented and we are asked to apply the *Chambers'* rule and analysis to it.

---

11. 497 F.2d, at 932–5.

1. "I don't know what you mean by 'glory,'" Alice said. Humpty Dumpty smiled contemptuously. "Of course you don't—till I tell you. I meant 'there's a nice knock-down argument for you!'" "But 'glory' doesn't mean 'a nice knock-down argument,'" Alice objected. "When *I* use a word," Humpty Dumpty said in rather a scornful tone, "it means just what I choose it to mean—neither more nor less." "The question is," said Alice, "whether you *can* make words mean different things." "The question is," said Humpty Dumpty, "which is to be master—that's all."

Lewis Carroll, Through the Looking Glass

The majority now vindicates warrantless searches of "mobile objects" in any context if a preceding warrantless seizure is constitutionally permissible. The express source of this reasoning is *Chambers* itself, which indicated that with respect to an automobile, a permissible warrantless seizure justified an immediate warrantless search. What the majority ignores in expanding *Chambers* to inter the non-auto search cases of United States v. Anderson, 5 Cir. 1974, 500 F.2d 1311; United States v. Lonabaugh, 5 Cir. 1973, 494 F.2d 1257; United States v. Garay, 5 Cir. 1973, 477 F.2d 1306, is that *Chambers* was expressly limited by Coolidge v. New Hampshire, 1971, 403 U.S. 443, 463 n. 20, 91 S.Ct. 2022, 29 L.Ed.2d 564, *solely* to the auto-search situation. Beyond this, *Chambers* cannot go.

More fundamentally, the majority's simplistic equation sweeps so broadly as to flout settled principles of Fourth Amendment law. The extent of a governmental intrusion into an individual's protected privacy has always been a critical component in determining reasonableness under the Fourth Amendment. For example, Terry v. Ohio, 1968, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, unmistakably teaches that a determination of the lawfulness of a warrantless seizure is only half the inquiry. Any ensuing search, an additional incursion, "must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." Id. at 19, 88 S.Ct. at 1878. Had Terry, when accosted on the street by the investigating officer, been transporting a suitcase, a full-scale search of the bag's contents would have presented a far different situation than a limited pat-down of his outer garments accomplished for the narrow purpose of detecting weapons. "The Fourth Amendment proceeds as much by *limitations upon the scope* of governmental action as by imposing preconditions upon its initiation." *Id.* at 28–29, 88 S.Ct. 1883. (Emphasis supplied).

Nor is Terry v. Ohio *sui generis.* The Supreme Court has consistently inquired

1. United States v. Garay, 477 F.2d 1306 (CA5, 1973).

2. United States v. Lonabaugh, 494 F.2d 1257 (CA5, 1973).

into the extent or scope of a warrantless incursion, demanding that the imposition on the citizen be no greater than the occasion requires. See, e. g., United States v. Van Leeuwen, 1970, 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282; Chimel v. California, 1969, 395 U.S. 752, 762–64, 89 S.Ct. 2034, 23 L.Ed.2d 685; Sibron v. New York, 1968, 392 U.S. 40, 65, 88 S.Ct. 1889, 20 L.Ed.2d 917. This Court has, until today, faithfully adhered to this analysis. See, e. g., United States v. Gravitt, 5 Cir. 1973, 484 F.2d 375; United States v. Cyzewski, 5 Cir. 1973, 484 F.2d 509; United States v. Skipwith, 5 Cir. 1973, 482 F.2d 1272. In short, necessity remains the *sine qua non* of exceptions to the warrant requirement. Auto searches aside, when the exigencies necessitating a warrantless incursion dissipate, resort to the magistrate must be had. As the Supreme Court has stated, "[w]e are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police." McDonald v. United States, 1948, 335 U.S. 451, 455, 69 S.Ct. 191, 193, 93 L.Ed. 153.

Whatever may be the final delineation of exceptions to the warrant requirement, we must vigilantly bear in mind that absent imperative circumstances a warrantless search is *per se* unreasonable. Coolidge v. New Hampshire, *supra*, 403 U.S. at 454–55, 91 S.Ct. 2022; Katz v. United States, 1967, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576. I respectfully submit that *Anderson, Lonabaugh* and *Garay* are correct expressions of this heretofore unchallenged principle. These cases are now overruled by the majority's transparent attempt to distinguish the indistinguishable. I dissent.

GODBOLD, Circuit Judge, dissenting as to Part I:

I agree with Judge Dyer except in his conclusion that *Garay,*[1] *Lonabaugh*[2] and *Anderson*[3] have been overruled.

3. United States v. Anderson, 500 F.2d 1311 (CA5, 1974).

I confess my confusion at the majority's rationale which seems to say on the one hand that since there were exigent circumstances Hale was empowered to seize, and having justifiably seized he could search (the "greater-lesser intrusion" theory), while on the other hand it distinguishes *Garay, Lonabaugh* and *Anderson* on the ground that in those cases the police already had "secure control" of the item involved (i. e., the "greater intrusion" already had been consummated), therefore there was no right to search. Despite this nonexplanation we are bound to accept and to apply the majority's conclusion that *Garay, Lonabaugh* and *Anderson* retain a field of operation and are viable in situations where they are applicable.[4]

SIMPSON, Circuit Judge, with whom DYER, Circuit Judge, joins, dissenting as to Part II:

I concur in Judge Dyer's dissent, and fully associate myself with his views as to the constitutionally impermissible nature of the warrantless search and seizure involved in this appeal.

Additionally, I dissent from Part II of the majority opinion for the en banc court, which adopts Part II of the panel opinion, 497 F.2d at 932–935. I disagree with Part II as to each of the two postulates it advances: (a) that a federal offense under Title 18, Section 657, was charged by any or either of the ten counts under which Mrs. Hand was indicted,[1] and (b) that there was proof of the commission of a federal offense under any or either of the indictment counts.[2]

As to (a) I am content to rest my position upon the statement of the panel opinion, 497 F.2d at 934, that

A skimpier assertion of jurisdiction can scarcely be imagined than we find here. The element is, moreover, one' which can in no sense be waived or cured by verdict, being of the type whose absence is available for consideration even on motion in arrest of judgment,

as well as the additional statements, 497 F.2d at 933:

The question of the existence vel non of insurance was not submitted to the jury as an element of the offense charged, and appellant contends that consequently the jury failed to find a crucial and jurisdictional element of the alleged crimes. As to the accusation of having embezzled from a federally insured institution, appellant is entirely correct: it was neither proved nor found.

The argument advanced by the panel opinion that Mrs. Hand knew what she was charged with, " * * * embezzling funds from her named employer * * * "—and hence the "plain and concise statement" requirement of Rule 7(c), F.R.Crim.P. was satisfied—is wide of the mark.

Mrs. Hand was not on trial in a state court, where general allegations of embezzlement from a specified employer

---

4. The majority's unqualified citation of United States v. Soriano, 497 F.2d 147 (CA5, 1974) (en banc) arguably implies that the decision in that case supports the greater-lesser intrusion concept. If such an implication is intended, it is not supportable. That decision explicitly rested upon the concept of automobile search and the nexus to an automobile search provided by the facts that the suitcases had just been removed from the taxicab and placed on the sidewalk and one of them searched contemporaneously with the removal. 497 F.2d at 149–150 and footnote 6. This court eschewed a generalized ruling on the applicability of the greater-lesser intrusion language of Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26

L.Ed.2d 419 (1970), to personal effects having no nexus to an automobile subject to search.

1. The indictment contained ten counts, each identical to the other nine except for dates and amounts. A sample count, Count I, is copied in the text of the panel opinion, (5th Cir.) 497 F.2d 933.

2. See the language of Mr. Justice Black in Cole v. Arkansas, 1948, 333 U.S. 196, 201, 68 S.Ct. 514, 517, 92 L.Ed.2d 644, 647:

"It is as much a violation of due process to send an accused to prison following conviction of a charge upon which he was never tried as it would be to convict him upon a charge that was never made".

Both sides of the coin appear here.

might suffice. Instead she was on trial in a court whose jurisdiction was limited to trying violations of federal laws, here specifically Title 18, U.S.C., Section 657. Jurisdiction, not affirmatively appearing from the face of the indictment, was simply never present.

As to the second proposition, that regardless of the shortcomings of the charge, as laid in the indictment, somehow a case was made out: in addition to the quotations, *supra*, from Part II of the panel opinion, I turn to an additional statement in that opinion, 497 F.2d at 933:

> It is undisputed that the United States offered no proof that the deposits of the Union were insured in the manner charged.

That was enough to end the matter.

As to the search point covered by Judge Dyer's dissent, the majority labors mightily to salvage a patently unconstitutional search and seizure. This *ad hoc* approach serves the purpose, in addition to preserving Mrs. Hand's conviction, of approving unbelievably sloppy police work.

As to Part II, to which this dissent is directed, incredibly inefficient and insufficient pleading and proof by a United States Attorney, or perhaps his assistant, while certainly not approved, is not condemned either. I do not perceive a valid reason for this court to rescue this gentleman.

That Mrs. Hand may escape from punishment is overshadowed here by more important considerations. Poor performance by investigators and prosecutors should not pass muster unscathed and uncensured on the basis of an *ad hominem* approach that guilt of some offense is clear from the record. This misconceives our prime function of reviewing errors of law. I suggest also that occasional merited criticism of police and prosecutors is beneficial to the advancement of good order and discipline.

Efficient crime detection and punishment is not advanced but is retarded when we place precedents such as today's in the books. It will return to vex us on another day.

With deference, I dissent from the majority opinion on the basis of these views as to Part II, as well as with respect to the unconstitutional search and seizure, so convincingly explicated by Judge Dyer.

## ON PETITION FOR REHEARING

### PER CURIAM:

It is ordered that the petition for rehearing filed in the above entitled and numbered cause be and the same is hereby denied.

WISDOM, THORNBERRY, GOLDBERG, DYER, SIMPSON and MORGAN, Circuit Judges, would grant the petition for rehearing for the reasons stated in Judge DYER's dissent to Part I of the opinion of the court en banc, GODBOLD, Circuit Judge, would do so for the reasons stated in his separate dissent to Part I of that opinion, and DYER and SIMPSON, Circuit Judges, would do so for the additional reasons stated in Judge SIMPSON's dissent to Part II thereof.