UNITED STATES of America,
Plaintiff-Appellee,

v.

Bonifacic DE LA FUENTE, Ronald Albert Cardenas, George Sierra, Pat Vargas, Augie D. Sierra, and Robert Stewart, Defendants-Appellants.

No. 75-2263.

United States Court of Appeals,
Fifth Circuit.

March 10, 1977.

Rehearing and Rehearing En Banc
Denied April 8, May 10, 1977.

Alan Brown, San Antonio, Tex., for De La Fuente.

Ruben Sandoval, San Antonio, Tex., for Cardenas.

Roy R. Barrera (Court-Appointed), Terrence McDonald, San Antonio, Tex., for George Sierra, Vargas and Augie Sierra.

William E. Stockey, Pittsburgh, Pa., for Stewart.

John E. Clark, U. S. Atty., John M. Pinckney, III, Asst. U. S. Atty., San Antonio, Tex., Richard S. Stolker, Dept. of Justice, Crim. Div., Washington, D. C., for plaintiff-appellee.

Before RIVES, GOLDBERG and GEE, Circuit Judges.

GEE, Circuit Judge:

The six defendants-appellants were convicted of conspiracy to distribute heroin and cocaine in violation of 21 U.S.C. § 846 and sentenced to fifteen years' imprisonment, to be followed by ten-year special parole terms. A wiretap on the telephone at the residence of defendant Cardenas supplied much of the evidence of defendants' involvement in a large-scale conspiracy for the distribution of heroin and cocaine. All defendants claim that the wiretap evidence should have been suppressed because of improper authorization and conduct of the electronic surveillance. Defendants George Sierra, Augie Sierra, Pat Vargas, and Ronald Cardenas raise fourth amendment objections to warrantless airport searches of George's heroin-filled suitcase. Augie Sierra and Pat Vargas argue that insufficient evidence linked them to the conspiracy. Defendant Stewart claims he was denied assistance of counsel at the pretrial suppression hearing when the court refused to grant a continuance while his attorney recovered from the flu. Stewart also urges that the judge who conducted the suppression hearing should have recused himself as too biased to preside over the subsequent bench trial. Finding all of these claims of error to be without merit, we affirm the convictions of all defendants.

## The Wiretap

On May 3, 1974, a special attorney for the Justice Department applied to a federal district judge for authorization to install a wire interception and pen register on telephone number 512–224–0455, located at *330* East Myrtle in San Antonio, Texas. The wiretap application was accompanied by affidavits attesting to the need for electronic surveillance and by a memorandum from the Attorney General's office signed "W. B. Saxbe," which authorized application for

the interception of wire communications for a twenty (20) day period to and from the telephone bearing number (512) 224–0455, located at *300* East Myrtle Street, San Antonio, Texas, in connection with the investigation into possible violations of Title 21, United States Code, Sections 952(a), 841(a)(1), 963, and 846, by Ronald Albert Cardenas, Thomas F. Lowery, George Donovan Sierra, Librado Miranda Rocha and Domingo Miranda Rocha, and others as yet unknown. [Emphasis supplied.] [1]

After a hearing on the application, the court issued an order authorizing the requested wiretap. The order contained the court's findings that probable cause existed to believe that the wire facility was being used in the commission of narcotics offenses and that normal investigative procedures had been tried without success or likelihood of success. The court ordered the wiretap to be terminated after evidence had been obtained as to the conspirators' identities and the nature and places of operation, or at the end of 20 days, whichever was earlier. The authorization mandated the minimization of interceptions and required reports at five-day intervals.

Thereafter, agents of the Drug Enforcement Administration installed an interception and pen register on telephone number 512–224–0455. Approximately 2300 telephone conversations were intercepted and recorded in whole or in part. Pursuant to minimization instructions given the monitoring agents, interception of those conver-

1. At the hearing in chambers on the government's application for wiretap authorization, the court took note of the address discrepancy between the wiretap application and the Attorney General's authorization memorandum and found specifically that 330 East Myrtle was the correct address and that the incorrect address in the Attorney General's memorandum resulted from a mere typographical error.

sations deemed personal was aborted. The wiretap was terminated on May 23, 1974.

Title III of the Organized Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, provides a "comprehensive scheme for the regulation of wiretapping and electronic surveillance." *Gelbard v. United States*, 408 U.S. 41, 46, 92 S.Ct. 2357, 2360, 33 L.Ed.2d 179 (1972). Section 2516 permits the "Attorney General, or any Assistant Attorney General specially designated by the Attorney General" to authorize application to a federal judge for an order approving the interception of wire or oral communications in the course of investigating designated categories of crime. Section 2518 prescribes the procedural steps for an application and the findings that the court must make before approving the requested wiretap. Section 2515 provides that any communication intercepted in violation of these statutory provisions shall not be received in evidence in any trial.

Appellants claim that the wiretap evidence against them should have been suppressed because the government failed to comply with the statute in five particulars.

1. *Proof of authorization by proper official.*—The Supreme Court in *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), held that Title III strictly limits the category of public officials who may authorize a wiretap application to the Attorney General and Assistant Attorneys General specially designated by him. In holding that no other Justice Department official could approve wiretaps, the Court emphasized that "the provision for pre-application approval was intended to play a central role in the statutory scheme and that suppression must follow when it is shown that this statutory requirement has been ignored." 416 U.S. at 528, 94 S.Ct. at 1832.

Relying on *Giordano's* insistance on personal wiretap approval by a statutorily designated official, appellants argue that the government here failed to give sufficient proof of the requisite approval, necessitating suppression of the wiretap evidence against them. At the pretrial suppression hearing, the government offered the memorandum from "The Attorney General," entitled "Authorization for Interception Order Application" and bearing the signature "W. B. Saxbe." Defendants objected unsuccessfully to introduction of the memorandum on the ground that the signature of the Attorney General had not been properly authenticated; and on appeal they urge that the lower court erred in admitting the wiretap evidence because there was no proper proof of personal authorization by the Attorney General. Defendants made no allegations and offered no proof that the Attorney General's authorizing signature was inauthentic or irregular in any way. Nonetheless, they contend that wiretap evidence obtained pursuant to a regularly-issued judicial authorization must be excluded unless the government discharges the burden of establishing proper wiretap authorization with proof admissible and admitted in suppression proceedings conducted under strict evidentiary rules. Specifically, defendants argue that the "Authorization for Application" called for by 18 U.S.C. § 2516, regular on its face, and apparently signed by former Attorney General William B. Saxbe, should have been formally authenticated in order for the trial judge properly to admit the challenged wiretap evidence.

Although defendants buttress their argument with emphasis upon the important policy of insuring the actual, personal approval of wiretap applications by a proper official, the sole legal stanchion raised to support their position is the evidence rule making authentication a necessary predicate to formal admission of documents in evidence at a trial on the merits. We of course share the concern manifested in *Giordano* that wiretap application authorizations receive the personal imprimatur of the attorney general or a specially designated assistant as required by statute. Mandating signature authentication—especially absent any allegation or evidence or irregularity—would represent, however, a cumbersome and inefficient mode of overseeing compliance with proper approval proce-

dures. Requiring that the government "prove up" the authorizing signature of the attorney general or specially designated assistant every time it wishes to introduce wiretap evidence at a criminal trial would insure a field day for captious and costless technical objections, yet give little assurance of effectively screening out wiretap evidence obtained without the prescribed authorization. Equally important, defendants' argument that signature authentication was necessary in this case overlooks two basic evidentiary principles applicable to suppression hearings. A proper adherence to these well-established and general precepts must lead to an affirmance of the court's ruling below, unless overriding policy considerations dictate a change in long-settled rules of evidence and proof governing suppression hearings.

▮ (a) *Evidence standards in suppression hearings.*—The first of the pertinent evidentiary maxims ignored by defendants was recently noted and approved by the Supreme Court, observing in *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), that "the same rules of evidence governing criminal jury trials are not generally thought to govern hearings before a judge to determine evidentiary questions." *Id.* at 173, 94 S.Ct. at 994. The

Court pointed to its own confirmation of this general principle as evidenced in its proposal to Congress of Federal Rules of Evidence 104(a) and 1101(d)(1), which provide that the trial court, in resolving preliminary fact questions concerning the admissibility of evidence, is not bound by the rules of evidence.[2] Noting that these rules adopted the general views of evidence authorities, the *Matlock* Court concluded:

> There is, therefore, much to be said for the proposition that in proceedings where the judge himself is considering the admissibility of evidence, the exclusionary rules, aside from rules of privilege, should not be applicable; and *the judge should receive the evidence and give it such weight as his judgment and experience counsel.*

415 U.S. at 175, 94 S.Ct. at 995 (emphasis added). On the particular facts before it, the Court held that the trial judge had erred in refusing to admit and consider at suppression proceedings reliable hearsay statements offered by the government to resolve a preliminary fact issue of the admissibility of evidence that the defendant sought to suppress.[3]

Relying on *Matlock*, we too have recently applied the principle that suppression hear-

---

**2.** Fed.R.Evid. 104(a), as proposed and adopted, provides:

> (a) Questions of admissibility generally. Preliminary questions concerning the qualifications of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

Fed.R.Evid. 1101(d)(1), as proposed and adopted, provides:

> (d) Rules inapplicable. The rules (other than with respect to privileges) do not apply in the following situations:
> (1) Preliminary questions of fact. The determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under rule 104.

**3.** Specifically, the defendant, indicted for bank robbery, attempted to suppress a large amount of cash that had been seized from a bedroom in a house where he resided with several other people. The search leading to discovery of the

money was admittedly conducted without a warrant and without probable cause, so that admissibility of the seized evidence turned entirely on whether the searching officers had received a valid consent to the search. At the suppression hearing the government proved that consent to search the bedroom had been given by a woman who lived in the same house as defendant. The determinative preliminary fact question was thus whether the woman and defendant exercised sufficient joint control over the bedroom as to make her consent binding on defendant. On this issue the trial court refused to consider the woman's statements to the searching officers that she and defendant both occupied the bedroom and slept together there. Recognizing that the statement constituted hearsay, the Supreme Court nevertheless held that the trial judge should have received and considered it in determining whether the woman's consent was valid against the defendant.

ings are not to be conducted under strict evidence rules. *United States v. Ransom*, 515 F.2d 885 (5 Cir. 1975), holds that the lower court committed no error in a suppression hearing by considering, in connection with a preliminary fact question, transcripts of intercepted phone conversations without requiring the government to establish an unbroken chain of custody for the taped conversations.[4] Chain-of-custody proof in *Ransom*, where the authenticity and accuracy of the tapes and transcripts were never impugned by either specific allegations or evidence from defendants, would have constituted time-consuming compliance with a superfluous formality. Similarly, in the instant case, to require authentication of Saxbe's signature, never seriously challenged by allegations or evidence, would exalt formalities over the fair and expeditious conduct of criminal trials.

As in *Matlock* and *Ransom*, the trial of appellants here was conducted prior to the effective date of the Federal Rules of Evidence.[5] *Matlock* clearly indicated, however, that the Rules' provision that a judge is not bound by exclusionary rules when determining the admissibility of evidence constituted but a codification of a widely accepted legal principle applicable also to pre-Rules proceedings. *Matlock*, recognizing a broad discretion in the trial court to consider at suppression hearings evidence not formally admissible on the merits, stated unequivocally that "the judge should receive the evidence and give it such weight as his judgment and experience counsel." 415 U.S. at 175, 94 S.Ct. at 995. Thus, the mere fact that the lower court admitted and considered the unauthenticated authorization is no ground for reversal by this court.

We may reverse the ruling of the judge below only by holding that the government

should now bear the unprecedented burden of proving, in every such case and with evidence admissible under strict rules, facts essentially uncontroverted by allegation or proof. Such a holding would constitute a major, wholly unjustified, departure from the long accepted placement of production and persuasion burdens in suppression proceedings.

■ (b) *Burdens of proof in suppression hearings.*—It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing. *E. g., Rogers v. United States*, 330 F.2d 535 (5 Cir. 1964); *Addison v. United States*, 317 F.2d 808 (5 Cir. 1963); *Wilson v. United States*, 218 F.2d 754 (10 Cir. 1955); *White v. United States*, 194 F.2d 215 (5 Cir. 1952); *Jarabo v. United States*, 158 F.2d 509 (1 Cir. 1946). Concededly, in some well-defined situations the ultimate burden of persuasion may shift to the government upon an initial showing of certain facts by the defendant. For example, if a defendant produces evidence that he was arrested or subjected to a search without a warrant, the burden shifts to the government to justify the warrantless arrest or search. *E. g., Manuel v. United States*, 355 F.2d 344 (5 Cir. 1966). Or if a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination. *E. g., United States v. Crocker*, 510 F.2d 1129 (10 Cir. 1975). Similarly, if a defendant seeks to suppress evidence as the fruit of an illegal wiretap and he proves that the tap was in fact unlawful, the burden shifts to the prosecution to prove that the evidence in question was obtained from another source and is not tainted by the illegal surveillance. *E. g., Alderman v.*

---

**4.** Defendants Ransom and De Mour, charged with unlawful possession of firearms, sought to suppress the guns seized during a search incident to their arrest, alleging that the warrantless arrest was made without probable cause. The challenged tapes and transcripts were of a conversation in which defendant Ransom and an informer (who consented to the recording)

made arrangements for a drug transaction. The government offered the tapes at the suppression hearing to show probable cause for arresting defendants when they arrived at the pre-arranged rendezvous for the drug exchange.

**5.** The Rules became effective July 1, 1975.

*United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). The instant case, however, does not fall within any of these established categories in which the government may bear the ultimate burden of persuasion. And even in those situations, the defendant must first discharge his initial burden of producing some evidence on specific factual allegations sufficient to make a prima facie showing of illegality. *E. g., Nardone v. United States, supra.*

This case is analogous to those in which an arrest or search was conducted under warrant but defendant challenges the legitimacy of the warrant itself. In *Batten v. United States*, 188 F.2d 75 (5 Cir. 1951), for example, defendant alleged that there had been no probable cause for issuance of a warrant. The court held that "the burden is on a defendant who seeks to suppress evidence obtained under a regularly issued warrant to show the want of probable cause" and concluded that defendant had failed to carry that burden. *Id.* at 77. The defendant in *United States v. Smith*, 499 F.2d 251 (7 Cir. 1974), attacked a search warrant on the ground that it had been issued upon affidavits containing false material allegations. The court held that the defendant was not even entitled to an evidentiary hearing because he had failed to make the necessary "initial showing" by affidavit or otherwise that the affidavits supporting the issuance of the warrant contained any misrepresentations.

▋ As in these warrant cases, the instant defendants challenge the underlying sufficiency of a judicially-issued wiretap authorization entirely regular on its face and supported by other facially regular documents. Defendants here alleged no particular facts in their motions to suppress and introduced no evidence at hearing or trial tending to show that Saxbe's signature was inauthentic or indicating a likelihood that someone other than the attorney general himself had approved the authorization to apply for the wiretap. Defendants thus failed completely to carry their initial, unshiftable burden of alleging and proving *some* fact sufficient to make a prima facie showing of illegality. Even in the understandable confusion surrounding the proper placing and shifting of burdens of proof and persuasion, we have not found a single case holding that a defendant can prevail at a suppression hearing by simply conjecturing that the government *might* have acted illegally. Appellate courts confronted with such speculations have consistently held that defendants must at least *allege* particular facts which would tend to indicate some government impropriety and that general, conclusory allegations based upon mere suspicions do not entitle a defendant to have evidence suppressed. *E. g., United States v. Smith, supra; United States v. Hickok*, 481 F.2d 377 (9 Cir. 1973); *Canaday v. United States*, 354 F.2d 849 (8 Cir. 1966). *Cf. also United States v. Tucker*, 526 F.2d 279 (5 Cir.), *cert. denied*, 425 U.S. 958, 96 S.Ct. 1738, 48 L.Ed.2d 203 (1976).

Nothing in the statute governing the authorization of wiretaps nor in the Supreme Court's construction of that statute in *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), and *United States v. Chavez*, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974), requires that the government must authenticate the attorney general's signature on an authorization order as a predicate to use of wiretap evidence. Congress could easily have provided the additional "safeguard" of requiring that an authorization signature be notarized, witnessed, or authenticated by personal testimony at trial before wiretap evidence could be admitted. Congress made no such provision, however; nor did it give any indication that the usual burden of proof in a suppression hearing should be shifted from the movant to the government in wiretap cases.[6] Furthermore, in the very

---

6. In fact, the principal piece of legislative history on the wiretap statute, S.Rep.No.1097, 90th Cong., 2d Sess. (1968), U.S.Code Cong. & Admin.News 1968, p. 2112, indicated that Congress intended no change in the general law of suppression. The report expressly stated that the statute's provision for suppressing illegally obtained wiretap evidence, 18 U.S.C.

opinion where the Supreme Court mandated strict adherence to wiretap authorization requirements, it implicitly recognized that defendants still bear the initial burden of showing some illegality in order to justify suppression of wiretap evidence. In *United States v. Giordano, supra,* the Court stated:

> We are confident that the provision for pre-application approval was intended to play a central role in the statutory scheme and that suppression must follow *when it is shown that this statutory requirement has been ignored.*

416 U.S. at 528, 94 S.Ct. at 1832 (emphasis added). Thus the Court clearly contemplated that it was the defendant's burden to show noncompliance as a prerequisite to exclusion of wiretap evidence, rather than the government's burden to prove compliance as a predicate to its admission.

In the instant case, defendants did not even allege that the wiretap authorization was inauthentic or legally insufficient; they simply asserted that the government must prove its authenticity. On such a record, the defendants utterly failed to discharge their burden; and the trial court—under the burden-of-proof rules generally applicable to suppression hearings—properly refused to exclude the wiretap evidence.[7] Because defendants' contention that authentication should be required finds no support in the wiretap statute or prior case law, the determinative question on this issue becomes whether any practical or policy considerations necessitate our radical judicial restructuring of proof and evidence rules in suppression proceedings.

(c) *Policy and practice.*—With their insistence upon signature authentication, defendants ask us to go the Congress and the Supreme Court one better in promoting the settled policy of insuring that every wiretap application is in fact personally considered and approved by a proper official. With this policy we have no quarrel. The remedy sought here, however, would do little to further the identified goal, while seriously undermining the equally important policy of minimizing the unnecessary burdens to be placed upon already-overburdened law enforcement and prosecutorial officials.

Heightened concern that courts closely scrutinize authorization procedures arises from the Supreme Court's emphasis in *Giordano* upon personal approval by statutorily-designated officials, as well as from past disregard of the approval requirements practiced under the administration of former Attorney General Mitchell. During the early years of Mitchell's tenure, various Justice Department officials routinely signed the names of the attorney general and others to wiretap authorizations in a complex "paper charade" designed to create the illusion of statutory compliance.[8] Federal courts with one voice denounced this

---

§ 2518(10)(a), "largely reflects existing law" and that there was no intention to "press the scope of the suppression role beyond present search and seizure law." S.Rep.No.1097, 90th Cong., 2d Sess. at 96 (1968), U.S.Code Cong. & Admin.News 1968, p. 2185. Such language negates any possible inference that Congress meant to make sweeping changes in the long established rules governing suppression hearings on the admissibility of wiretap evidence.

**7.** Another panel of this court recently concluded, as did the trial judge in this case, that defendants' mere suggestions that an authorizing signature might be inauthentic is insufficient to require suppression of wiretap evidence. In *United States v. McCoy,* 539 F.2d 1050 (5 Cir. 1976), the court said:

The appellants also complain that "[t]here is no testimony before the Court that shows that Mr. Petersen actually signed the application." In a number of reported cases Justice Department officials signed the names or initials of others. *See, e. g., United States v. Chavez,* 1974, 416 U.S. 562, 567, 94 S.Ct. 1849, 40 L.Ed.2d 380. The appellants failed even to contend there that the government was obligated to authenticate Petersen's signature by testimony or affidavit. This Court cannot give weight, therefore, to the appellants' suggestion that what appears to be Petersen's signature is bogus. 539 F.2d at 1055.

**8.** *See United States v. King,* 478 F.2d 494 (9 Cir. 1973), *cert. denied,* 414 U.S. 846, 94 S.Ct.

practice;[9] and in recent cases the government has given repeated assurances that the command of the statute and of *Giordano* is now followed in spirit and letter: each wiretap receives personal approval by a designated officer, and signatures are no longer falsified.[10]

We find no indication in recent reported cases that the government's assurances of strict compliance may not now be credited. Although justified in an abundance of caution for a period after discovery of the Justice Department's wiretap misconduct,[11] federal courts need not forever burden prosecutors with mandatory signature authentication to punish or prevent earlier and discredited practices.

Moreover, looking beyond policy to practice, we find little reason to believe that an authentication requirement would represent a meaningful additional guarantee of personal wiretap approval. Defendants suggest, for example, that the wiretap authorization in the instant case might have been sufficiently authenticated—and thus admissible—if Saxbe's signature had been notarized or attested by witnesses. However, Justice Department officials inclined to falsify the authorizing signature might also falsify the notarization or attestation. Defendants then might well challenge the authenticity of the "authentication" and require proof of the supporting signatures. Even an affidavit from the purported signer himself that he did sign or personally approve the authorization is insignificant additional assurance, since an attorney general who countenances the routine falsifica-

tion of signatures would presumably have little compunction about lending *post hoc* legitimacy to a wiretap he had not in fact previously approved. In short, once we start down this road, we are likely to be driven to the position that the only meaningful "authentication" of a questioned signature or authorization is the direct testimony of the signer, of witnesses, or of a handwriting expert, whose testimony and credibility may be challenged by cross-examination.

To require direct testimony—or even affidavits—in support of an authorization signature, which, as in this case, has never been seriously challenged by defendants' charges or proof, would impose an inordinate burden upon the government; every defendant, if well advised, would insist on "authentication." We hold therefore that the prosecution need not prove the authenticity of a facially regular wiretap authorization where defendants have failed to allege or prove any facts tending to indicate some government impropriety.

On the other hand, recognizing the special nature of the wiretap authorization procedure provided by statute and reinforced by *Giordano*, we do not require defendants, either, to bear an unreasonable burden. We believe, however, that a rule can be fashioned under which defendants' rights receive adequate protection without imposing undue requirements of proof on the prosecution. For example, if a defendant supports his motion to suppress wiretap evidence with affidavits alleging specific facts indicating a likelihood of government

111, 38 L.Ed.2d 94, for a detailed explanation of the mechanics of this "paper charade."

**9.** *See, e. g., United States v. Chavez, supra; United States v. King, supra.*

**10.** *See, e. g., United States v. Chavez, supra; United States v. Ceraso*, 467 F.2d 647, 650 n. 7 (3 Cir. 1972).

The government similarly assures us in this case that since procedure changes effected in November, 1971,

no one other than the Attorney General or a specially designated Assistant Attorney General may approve or sign an authorization to apply to a federal court for a wiretap. Accordingly, there was no occasion in this case

for anyone other than William Saxbe to affix the Saxbe signature to the authorization memorandum.

Brief for Government at 17 n. 11.

**11.** *See, e. g., United States v. Curreri*, 363 F.Supp. 430 (D.Md.1973), in which the court noted recent cases showing that Justice Department personnel had signed superiors' names to wiretap authorizations and refused to accord the usual presumption of regularity to an authorization apparently signed by Acting Attorney General Richard Kleindienst.

misconduct, the trial court might then shift to the government the burden of proving (with more than an unauthenticated memorandum) proper compliance with authorization procedures. Defendants might make this threshold showing of possible illegality with a handwriting exemplar from the purported signer which differs from the authorization signature. Or a defendant might show a present "pattern" of Justice Department violation of wiretap authorization procedures as revealed in other recent cases or uncovered through discussions with prosecutors or Justice Department officials.

The policy of insuring government compliance with statutory wiretap requirements is, of course, a compelling one. Careful consideration of the probable effect of the blanket authentication requirement urged by defendants has convinced us, however, that benefits to the accused would be minimal, while the burden on criminal prosecutions might be staggering. Congress has evidenced a clear intent that wiretap evidence properly procured shall be received. We find no reason here to add to the difficulty of presenting such evidence special impediments beyond those mandated by Congress or generally applied in analogous cases. We thus hold that the court below properly considered the wiretap authorization without requiring formal authentication of the attorney general's signature.

■ 2. *Incorrect address.*—The Attorney General's memorandum authorizing application for a wiretap order incorrectly listed the address of defendant Cardenas as 300 E. Myrtle, while the judge's order stated the correct address of 330 E. Myrtle. At the wiretap application hearing, the court specifically found that the incorrect address on the Attorney General's authorization resulted from a mere typographical error. Defendants argue that the court's supplying the correct address amounts to the court itself authorizing the wiretap without the requisite Justice Department approval. Only the Attorney General himself, defendants contend, may correct the address.

We have previously held that clerical errors resulting in an incorrect digit or inversion of digits in target telephone numbers does not invalidate a wiretap application or order. E. g., *United States v. Doolittle*, 507 F.2d 1368 (5 Cir.), *aff'd en banc*, 518 F.2d 500 (5 Cir. 1975), *cert. denied* 423 U.S. 1008, 96 S.Ct. 439, 46 L.Ed.2d 380; *United States v. Sklaroff*, 506 F.2d 837 (5 Cir. 1975), *cert. denied*, 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105. Similarly, we find no merit in the argument that we should invalidate the wiretap order in the instant case simply because the application authorization contained a typographical error in the address.

■ 3. *Alternatives to wiretap.*—Section 2518(1)(c) of 18 U.S.C. provides that a wiretap application shall include a statement of the reasons why other investigative procedures have failed or why they reasonably appear likely to fail or to be too dangerous to attempt. Section 2518(3)(c) requires the judge issuing the order to determine that normal investigative procedures are dangerous or unlikely to succeed. Defendants Stewart and de la Fuente contend that the government's showing in the instant case was inadequate to support the court's finding that a wiretap was necessary.

An affidavit submitted with the government's wiretap application alleged that undercover agents' attempts to infiltrate the suspected conspiracy had repeatedly failed. Further efforts might pose unreasonable risks, since the organization was known to engage in violent reprisals against those who jeopardized its operations. A confidential informant had expressed his unwillingness to testify against the conspirators out of fear for his life.

In *United States v. Robertson*, 504 F.2d 289 (5 Cir. 1974), *cert. denied*, 421 U.S. 913, 95 S.Ct. 1568, 43 L.Ed.2d 778, we considered a similar challenge to the adequacy of the government's showing of need for a wiretap:

We first note that §§ 2518(1)(c) and (3)(c) must be read in a common sense fashion. They are "simply designed to assure that wiretapping is not resorted to in situa-

tions where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn,* 1974, 415 U.S. 143, 153 n.12, 94 S.Ct. 977, 983, 39 L.Ed.2d 225. . . . Their purpose "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Pacheco,* 5 Cir. 1974, 489 F.2d 554. The provisions contemplate that "the showing be tested in a practical and commonsense fashion." S.Rep.No.1097, 90th Cong., 2d Sess., 100 U.S.Code Cong. & Admin.News 1968, pp. 2112, 2190. 504 F.2d at 293. We find that the affidavits submitted by the government, "tested in a commonsense fashion," alleged sufficient facts to support the court's finding that more traditional investigative procedures were both dangerous and unlikely to succeed, thus warranting the issuance of a wiretap order.

■ 4. *Failure to name de la Fuente.* —Section 2518(1)(b), 18 U.S.C., requires that the applicant for a wiretap set forth, *inter alia,* "the identity of the person, if known, committing the offense and whose communications are to be intercepted." Defendant de la Fuente argues that the government's failure to name him in its wiretap application as a person "whose communications are to be intercepted" violated the requirement and rendered the wiretap evidence inadmissible against him. De la Fuente has shown no prejudice to him from omission of his name from the application, nor has he alleged that the government acted in bad faith in failing to name him.

The Supreme Court recently considered an identical argument in *United States v. Donovan,* —— U.S. ——, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). The Court held that a wiretap application must name all individuals that the government has probable cause

to believe are engaged in the criminal activity under investigation and whose conversations are expected to be intercepted over the target telephone. However, continued the Court, failure to name a known individual does not require suppression of wiretap evidence against them. We join the *Donovan* Court in urging that the government strictly adhere to this naming requirement in future wiretap applications. In the instant case, however, we hold on the authority of *Donovan* that the failure to name defendant de la Fuente in the wiretap application did not necessitate suppressing the evidence against him.

■ 5. *Failure to minimize.*—Defendants' final argument against admissibility of the wiretap evidence is that the government failed to minimize its interception of conversations as required by 18 U.S.C. § 2518(5). Agents monitoring the wiretap conversations received and followed specific instructions to terminate irrelevant or personal calls as soon as they determined that the calls were unrelated to the conspiracy. We find that the agents took all reasonable and practical steps to limit their interception to conversations related to the conspiracy. *See United States v. Doolittle, supra.*

Finding no merit in any of the challenges to the wiretap evidence, we hold that the court below properly admitted it against all defendants.

### Search of George Sierra's Suitcase

■ Several defendants challenge warrantless airport searches of George Sierra's suitcase, which resulted in the discovery of a large quantity of heroin admitted into evidence at trial.[12] George's suitcase was first opened and searched by DEA Agent Overstreet on May 15, 1974 in the San Antonio airport. At that time Agent Overstreet plainly had probable cause to believe that the suitcase contained contraband. He knew that wiretaps on the telephone at 330 East Myrtle had revealed the existence and dimensions of a large narcotics-distribution

---

**12.** Because we find that the challenged searches violated no constitutional rule, we do not consider the preliminary question of wheth-

er all or any of the coconspirators, other than George Sierra himself, have standing to challenge the search of George's suitcase.

conspiracy. He knew that a sale of heroin or cocaine by Cardenas and his confederates was about to be consummated with Stewart, a Pittsburgh buyer. Delivery was scheduled for May 14 or 15, and George Sierra was to be the courier to Pittsburgh. On May 15, agents observed George Sierra with a green suitcase leaving the residence at 330 East Myrtle in a station wagon driven by Pat Vargas. Vargas drove George to the San Antonio airport where he purchased a ticket to Pittsburgh, with a plane change in Houston. He checked his suitcase and proceeded to the boarding gate.

At this point Agent Overstreet had sufficient probable cause for a search, but insufficient time before George's plane departed to obtain a search warrant. Fearful that Sierra might retrieve his luggage and flee before reaching Pittsburgh or that the suitcase might be lost in transit,[13] Agent Overstreet opened the suitcase, observed and photographed the packages of heroin inside, and then allowed it to continue on its way, hoping that Sierra and his suitcase would lead the government to unknown accomplices in Pittsburgh.

Defendants urge that this warrantless search was illegal and that the heroin discovered in George's suitcase by Agent Overstreet should have been excluded from evidence at their trial. Even though Overstreet had probable cause to believe that the suitcase contained contraband, they argue, he was only authorized to *seize* the luggage and hold it until he could obtain a warrant. This issue is controlled by our recent *en banc* decision in *United States v. Hand*, 516 F.2d 472 (5 Cir. 1975). In *Hand*,

the bookkeeper for a federal credit union, who had just admitted that she juggled books to conceal a cash shortage, indicated that she was sending for some of her purses which were in the Union office. Before she could retrieve the purses, however, a federal agent opened them and discovered more than 150 vouchers minuting cash transactions in tens of thousands of dollars. We held this warrantless search justified because the agent's probable cause to believe that the purses contained evidence was joined with exigent circumstances necessitating immediate action. Hand raised the contention advanced by defendants herein. that at most the agent was authorized to seize and hold the purses until he obtained a search warrant. We rejected the argument there, and we reject it again here, relying on the conclusion of *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970), that "[g]iven probable cause to search, either course [search or seizure] is reasonable under the Fourth Amendment." [14]

In the circumstances of the instant case, Agent Overstreet had insufficient time to secure a search warrant before George Sierra's plane departed. If he either arrested George or detained the suitcase at the San Antonio airport, however, he would frustrate any further efforts to discover other conspirators in Pittsburgh. With probable cause to search and the exigent circumstance of the imminent departure of George's plane, Agent Overstreet's decision to search the suitcase and send it on its way rather than to detain it and await a warrant was quite reasonable. We thus hold

---

**13.** Apprehension that the suitcase might be lost in transit proved to be well founded, since the green suitcase was in fact misrouted and failed to arrive in Pittsburgh with George Sierra. The luggage did, however, arrive on a later flight.

**14.** Defendants cite *United States v. Garay*, 477 F.2d 1306 (5 Cir. 1973), to support their position that Agent Overstreet should have seized and held the suitcase until a search warrant issued. Whatever vitality *Garay* and similar holdings in *United States v. Lonabaugh*, 494 F.2d 1257 (5 Cir. 1973), and *United States v. Anderson*, 500 F.2d 1311 (5 Cir. 1974), retain after our decision in *Hand, see United States v.*

*Hand, supra* at 476 n.10, the facts in those cases differ materially from the instant case. In *Garay, Lonabaugh*, and *Anderson*, the defendants were arrested or restrained by police and their baggage was under complete police control, so that no exigent circumstance excused application to a magistrate. Moreover, investigation in those cases had ceased with defendants' detention; while in the instant case, detention of either George Sierra or his suitcase would have thwarted the agents' efforts to discover the conspiracy's accomplices in Pittsburgh.

that the search of George Sierra's suitcase at the San Antonio airport was proper, and the heroin discovered was admissible at trial.

■ Defendant Cardenas also objects to a warrantless "search" of George's suitcase at the Pittsburgh airport. The suitcase had been inadvertently misrouted; and when it failed to arrive in Pittsburgh, George Sierra filed a lost baggage report. A suitcase matching the report's description later arrived at the Pittsburgh airport, but it carried no ownership identification on the exterior. An airline employee, following his usual procedure, opened the suitcase in an attempt to determine its ownership; and a DEA agent standing nearby observed in plain view plastic bags containing what later proved to be heroin. The baggage agent's opening of the suitcase was clearly a private search, not subject to fourth amendment strictures. *E. g., United States v. Mekjian*, 505 F.2d 1320 (5 Cir. 1975); *United States v. Ogden*, 485 F.2d 536 (9 Cir. 1973), *cert. denied*, 416 U.S. 987, 94 S.Ct. 2392, 40 L.Ed.2d 764 (1974); *United States v. DeBerry*, 487 F.2d 448 (2 Cir. 1973). The DEA agent had a right to be where he was and to observe the contraband in his plain view. *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). The Pittsburgh "search" thus violated no fourth amendment rights of any of the defendants.

### Sufficiency of Evidence

■ Defendants Pat Vargas and Augie Sierra argue that the evidence was insufficient to connect them with the conspiracy and to sustain their convictions. The settled rule is that once the existence of a conspiracy is established, only *slight* evidence connecting each defendant to the conspiracy is required. *E. g., United States v. Prince*, 515 F.2d 564 (5 Cir. 1975); *United States v. Reynolds*, 511 F.2d 603 (5 Cir. 1975); *United States v. Wayman*, 510 F.2d 1020 (5 Cir. 1975), *cert. denied*, 423 U.S. 846, 96 S.Ct. 84, 46 L.Ed.2d 67. Evidence establishing the existence of a conspiracy to distribute narcotics was overwhelming. View-

ing the proof connecting Vargas and Augie Sierra to the conspiracy in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), it is clear that there was at least the requisite "slight evidence" of connection to support their convictions.

The evidence at trial showed that Pat Vargas resided at the same address as Cardenas, the conspiracy's kingpin, and George Sierra, the man who transported the heroin-filled suitcase to Pittsburgh for delivery to the buyer. Vargas had a close relationship with Sierra, and she drove him and his suitcase to the San Antonio airport for the Pittsburgh trip. After George's arrest, Vargas told Cardenas, "I told you we should've took it in the car. . . ." Moreover, a taped conversation between Vargas and George after his arrest indicated that George authorized her to sell five grams of heroin for him for a one-third commission.

Augie Sierra's role as the intended supplier of narcotics for the conspiracy was also adequately established at trial. In a taped conversation with George Sierra, Augie agreed to find out current prices for cocaine and marijuana. Two days later, Augie spoke with Cardenas by phone to advise him that he had told George about "a deal we got down there." He instructed Cardenas to give George the money for the "two items" (cocaine and marijuana), and Augie quoted the prices for cocaine and marijuana. Other evidence indicated further attempts after George's arrest by Augie, Cardenas, and de la Fuente to arrange for Augie to procure additional drugs for delivery to the Pittsburgh buyer.

Viewed most favorably to the government, the evidence against Vargas and Augie Sierra sufficiently connected them to the conspiracy so as to sustain their convictions.

### Stewart's Claims

■ 1. *Continuance.*—Defendant Stewart urges error in the trial court's refusal to grant his motion for a continuance of the suppression hearing until his attor-

ney recovered from the flu. Stewart contends that the refusal deprived him of assistance of counsel at the suppression hearing. It is undisputed that this was the first continuance requested and that Stewart's counsel was truly ill. Nevertheless, the granting of a continuance rests within the discretion of the trial judge, and "it is not every denial of a request for more time that violates due process." *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964). We have held that the trial court's exercise of discretion in granting or denying a motion for continuance will not be disturbed on appeal except upon a showing that "the action of the trial court was in fact prejudicial to the defendant." *United States v. Clements*, 484 F.2d 928, 930 (5 Cir. 1973).

Defendant Stewart has demonstrated no prejudice to him from the denial of his continuance request. Stewart raised the same challenges to the wiretap evidence as were raised by the other defendants. All the objections were forcefully argued at the suppression hearing by counsel for the co-defendants. Moreover, counsel for Stewart and the other defendants reurged at trial their objections to admission of the wiretap evidence; and all have argued them yet again on this appeal.

Stewart and his counsel have had ample opportunity to challenge the admissibility of the government's evidence. On these facts, we can see no possibility of prejudice to Stewart flowing from the unavoidable absence of his counsel at the suppression hearing.

■ 2. *Judicial bias.*—Defendant Stewart additionally contends that the trial judge, having ruled adversely to him in the pretrial suppression hearing, should have recused himself from the case as unable to render a fair and impartial decision on the issue of Stewart's guilt. We need not consider this issue of alleged bias because Stewart never properly raised it in the court below by filing the "timely and sufficient affidavit" required by 28 U.S.C. § 144.[15] Stewart's counsel orally requested transfer of the case to another judge. The court denied the request, but invited counsel to file a written motion. No written request or affidavit was ever filed, and informal requests for recusal do not constitute sufficient compliance with 28 U.S.C. § 144. *See, e. g., Galella v. Onassis*, 487 F.2d 986 (2 Cir. 1973); *Morrison v. United States*, 432 F.2d 1227 (5 Cir. 1970), *cert. denied*, 401 U.S. 945, 91 S.Ct. 959, 28 L.Ed.2d 227 (1971).

■ However, even if the question had been properly raised below and preserved on appeal, Stewart has made no showing of bias which would warrant us in overturning the trial court's denial of the recusal motion. Merely presiding at a pretrial suppression hearing does not disqualify a judge from conducting the trial on the merits.

Finding no merit in any of the allegations of error, we affirm the convictions of all defendants.

---

**15.** 28 U.S.C. § 144 provides:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.