**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Lenin JUAREZ and Oscar Juarez,**
**Defendants-Appellants.**

No. 77–5217.

United States Court of Appeals,
Fifth Circuit.

May 19, 1978.

Rehearing and Rehearing En Banc
Denied July 20, 1978.

**270**

George E. Gilkerson and John T. Montford, Lubbock, Tex., for L. Juarez.

Max E. Ramsey, Odessa, Tex., for O. Juarez.

Jamie C. Boyd, U. S. Atty., LeRoy Morgan Jahn, Ronald P. Guyer, W. Ray Jahn, Wayne F. Speck, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before THORNBERRY, AINSWORTH and MORGAN, Circuit Judges.

AINSWORTH, Circuit Judge:

A jury convicted defendants-appellants Lenin Juarez and Oscar Juarez on one count of conspiring to possess with intent to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846, on two counts of aiding and abetting possession of heroin with intent to distribute in violation of 18 U.S.C. § 2, and on three and one counts, respectively, of aiding and abetting the distribution of heroin in violation of 18 U.S.C. § 2. Oscar Juarez was also convicted on two counts of distributing heroin in violation of 21 U.S.C. § 841(a)(1). The district court sentenced each defendant to ten years' imprisonment with a special parole term of three years on each count, the sentences to run concurrently.[1] The defendants now appeal, urging thirteen points of error by the trial court. Finding none of their contentions meritorious, we affirm.

## I. *The Facts*

The scenario begins in the Playgirl Lounge in Lubbock, Texas, where, on May 24, 1976, a confidential informant introduced DEA Agent Pedro T. Hernandez to Joe Miguel Gerhardt. The informant earlier had told Hernandez that a Lubbock lawyer was dealing in narcotics, and Hernandez was seeking to determine his identity. Hernandez communicated to Gerhardt his desire to purchase an ounce of heroin. Gerhardt seemed interested and responded that he could make the sale himself but first would have to contact his connection. Government agents then followed Gerhardt to the Lubbock home of defendant Lenin Juarez, a 32-year-old attorney practicing law in Lubbock, on to a road sign located approximately twelve miles from Kermit, Texas, and finally to the Village Inn in Lubbock, where Gerhardt sold Hernandez one ounce of heroin for $1,000. On July 12, 1976, Gerhardt and Hernandez consummated a second sale at a location approximately twenty-four miles north of Midland, Texas on Highway 176. Once again Gerhardt sold Hernandez one ounce of heroin for $1,000. A third sale occurred between Hernandez and Gerhardt on September 14, 1976 at a liquor store parking lot in Lubbock. This time, however, the stakes were higher; four ounces of heroin and $4,000 exchanged hands. On September 23, 1976, Hernandez and Gerhardt met a fourth time, on this occasion in a cafeteria parking lot in Lubbock. Hernandez, accompanied by DEA Agent Ed Alcorn, informed Gerhardt that he was a DEA agent, that a grand jury soon would indict Gerhardt, and that Gerhardt would be wise to cooperate with the Government. Gerhardt agreed to become

---

1. The sentence imposed on Oscar Juarez is to run consecutively with sentences imposed earlier by a state court in New Mexico and by the United States District Court for the Western District of Texas, Pecos Division.

an informant and stated that two brothers, Lenin Juarez of Lubbock and Oscar Juarez of Kermit, were his suppliers.

Gerhardt revealed further that he first met Lenin Juarez in April or May of 1975 at the Sportsman's Club in Lubbock, where Juarez recruited him to sell heroin "on the streets" at a fee to Gerhardt of $300 an ounce. Gerhardt was instructed to obtain the heroin in Kermit from Oscar Juarez. Thereafter, Gerhardt made numerous trips to Kermit in order adequately to supply his customers. In the latter part of 1975 Lenin Juarez instructed Gerhardt to cease contacting Oscar Juarez directly. Instead, the heroin was to be buried no more than a foot deep alongside a road near Kermit, with road signs and an historical marker to be used to identify the burial site. The plan called for Gerhardt to meet Lenin Juarez at his law office, his home, or in various bars to place an order, at which time Juarez would notify his brother Oscar to bury the heroin and would recontact Gerhardt to inform him when and where he could pick it up. The conspirators continued to follow this procedure up until the time of their arrests. This also was the method used to service Agent Hernandez's purchases.

Shortly after telling his story to the agents on September 23, Gerhardt placed a telephone call to Lenin Juarez. The conversation was "coded" and in Spanish and, with Gerhardt's consent, was recorded by DEA agents. Juarez told Gerhardt the "five pieces of paper" were ready to be picked up but there was no need for Gerhardt to hurry unless he needed them. After the conversation, either that same day, September 23, or the day after, September 24, Gerhardt guided Agent Hernandez to a sign located approximately nine miles northeast of Kermit. The sign read "One Mile to Historical Marker." Beginning at the sign and walking in a line perpendicular to the road, Hernandez and Gerhardt came to a fence with a ribbon tied to it. Approximately ten inches beneath the ground directly under the ribbon Hernandez found a baby food jar containing four ounces of heroin. Gerhardt next led two other DEA agents to a location in Abernathy, Texas, where they found approximately one and one-half more ounces of heroin.

On September 27, 1976, DEA agents gave Gerhardt $1,500 in government funds to pay Lenin Juarez for prior sales of heroin. Gerhardt delivered the money to Juarez at his home and chatted with him about their heroin business.[2] Government agents also recorded this conversation, with Gerhardt's consent, through a microphone taped to Gerhardt's body. The agents made no attempt to recover the funds passed in this meeting, however.

A second meeting between Lenin Juarez and Gerhardt was planned for 9:30 p.m. on September 30, 1976 at the Ambassador Club in Lubbock. The purpose of this meeting was to enable Gerhardt to pay Juarez for heroin which Juarez thought had been sold but which in fact had been turned over to DEA agents on September 23 or 24. Agents provided Gerhardt a roll of marked government funds amounting to $4,000, which the agents decided to seize from Juarez if he accepted it. No warrant to search or arrest Juarez was obtained.[3]

On September 30, Gerhardt entered the Ambassador Club at approximately 10:15 p.

2. During the conversation Juarez questioned Gerhardt as to whether Agent Hernandez was a DEA agent. Juarez stated further that he had become suspicious because he had observed a person in an automobile taking pictures of his office, and he feared the photographer also was an agent.

3. Agent Hernandez explained at trial that the time and place of the meeting between Juarez and Gerhardt was not known until the evening of September 30 because the time and place were to be provided by Juarez, whom Gerhardt had been unable to contact until that evening.

According to Hernandez, there was not enough time to obtain a search warrant after the agents finally ascertained the meeting time and place. Agent Richard Brazil testified further that he and other agents had completed the preparatory paperwork to obtain a warrant to search Juarez at his home or office if the meeting had been set for either of those locations. Additionally, no arrest warrant was ever sought because the Government had decided first to present Juarez's case to a grand jury to obtain an indictment.

m. Agent Hernandez was already stationed inside while other agents were in strategic locations outside the club. Gerhardt met Lenin Juarez at the bar and, after talking briefly, the two retired to the restroom where Gerhardt paid Juarez the $4,000. Gerhardt then returned to the bar area, signaled to Hernandez by removing his hat and scratching his head that Juarez had accepted the money, and left the club. It was approximately 10:30 p. m. Juarez left about half an hour later with a friend named Arthur Chavez. Juarez and Chavez walked to Chavez's car where Juarez gave Chavez the $4,000 to keep temporarily for him. When a young woman appeared and entered the bar, Chavez decided to return to the club, at which point Juarez regained possession of the money and began walking toward his own car. The time was approximately 11:15 p. m.

The DEA agents stationed outside the club then moved in and stopped Juarez. Agent Richard Brazil informed him they were conducting a narcotics investigation and, after advising him of his Miranda[4] rights, told Juarez he was suspected of possessing government funds involved in a narcotics transaction. Brazil then asked him if he possessed any government funds and Juarez said he did not. "Well, I am going to have to search you," replied Brazil. Juarez, according to the testimony of DEA Agent Delbert W. Stiewert, who was assisting Brazil, replied, "That's fine," a statement Juarez denied repeatedly at trial. A warrantless search of Juarez produced the $4,000 roll of marked government funds, which was concealed in his left sock, and which Agent Brazil seized. Juarez explained that a client had given him the money as legal fees, but that the client's name was privileged information,[5] and he was allowed to leave. Subsequently, on October 12, 1976, a grand jury indicted both Lenin and Oscar Juarez, at which time they were arrested.

II. *The Search*

Defendants contend first that the district court erred in failing to suppress as inadmissible evidence the $4,000 roll of marked government funds taken from Lenin Juarez, because allegedly these funds were the product of a "planned, warrantless search" conducted without Juarez's consent and therefore in violation of the fourth amendment. Both Lenin and Oscar Juarez urge this point of error, but Oscar Juarez has no standing to complain because he has not demonstrated a legitimate interest in either the premises searched or the object seized. *E. g., United States v. Hunt,* 5 Cir., 1974, 505 F.2d 931, 939–40, *cert. denied,* 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975). *See, e. g., United States v. Archbold-Newball,* 5 Cir., 1977, 554 F.2d 665, 667–79; *United States v. Houltin,* 5 Cir., 1976, 525 F.2d 943, 946–47, *vacated in part sub nom., Croucher v. United States,* 429 U.S. 1034, 97 S.Ct. 725, 50 L.Ed.2d 745, *modified,* 5 Cir., 1977, 553 F.2d 991. We turn, therefore, to the contentions of Lenin Juarez.

A well-settled tenet of fourth amendment jurisprudence is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). Lenin Juarez suggests that the warrantless search of his person does not fall into any of these exceptions. We disagree and hold that the search was legal under both the consent and the exigent circumstances exceptions to the fourth amendment warrant requirement.

A. *Consent*

■ An exception to the requirements of both a warrant and probable cause is a search conducted pursuant to consent. *E.*

4. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. Juarez contends he was representing Gerhardt's family in a civil rights action against a local sheriff's department and the $4,000 was given to him as partial payment of his legal fees.

g., *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973). When the Government seeks to justify the lawfulness of such a search it bears the burden of proving that the consent was voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). The Supreme Court defined "voluntary consent" in the context of the fourth and fourteenth amendments in *Schneckloth v. Bustamonte, supra*, 412 U.S. at 248–49, 93 S.Ct. at 2059:

> [W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.

■ Prior to trial the district court conducted an evidentiary hearing on the motion to suppress and concluded that Lenin Juarez voluntarily consented to Agent Brazil's search. The lower court based its conclusion on the factual finding that Juarez replied "That's fine" to Brazil's declaration of his intention to conduct the search. Juarez strenuously denies ever uttering such a reply, and points out that only assisting Agent Stiewert, and not Brazil, testified that he did. This Court must accept the trial court's findings of fact on a motion to suppress, however, unless they are clearly erroneous, *e. g., United States v. Griffin*, 5 Cir., 1977, 555 F.2d 1323, 1324, and we discern no error in the trial court's finding here. Agent Stiewert testified that Lenin Juarez said "That's fine" and Lenin Juarez testified that he did not. The trial court apparently believed Stiewert. *See United States v. Almand*, 5 Cir., 1978, 565 F.2d 927, 930.

■ In any event, we have independently reviewed the record to determine the propriety of admitting the government funds into evidence on the basis of consent. *See United States v. Hall*, 5 Cir., 1978, 565 F.2d 917, 920; *United States v. Smith*, 5 Cir., 1976, 543 F.2d 1141, 1145, *cert. denied*, 429 U.S. 1110, 97 S.Ct. 1147, 51 L.Ed.2d 564 (1977); *United States v. Horton*, 5 Cir., 1973, 488 F.2d 374, 380, *cert. denied*, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974). This comports with the mandate of the Supreme Court in *Schneckloth v. Bustamonte, supra*, 412 U.S. at 227, 93 S.Ct. at 2047, that voluntariness of consent should be determined only after "a careful scrutiny of all the surrounding circumstances." Numerous facts in the record convince us that, from the totality of all the circumstances, Lenin Juarez's consent was voluntary. There is no evidence in the record that the DEA agents threatened or intimidated Juarez, either physically or psychologically, and Juarez makes no such claims. *See, e. g., United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976); *United States v. Hall, supra*, 565 F.2d at 921. It appears that the officers were polite, though firm, at all times. The officers did not make any promises to him, or engage in any sort of trickery, or employ any more subtle forms of coercion or duress that may have affected his judgment. *See United States v. Watson, supra*, 423 U.S. at 424, 96 S.Ct. at 828; *Hoffa v. United States*, 385 U.S. 293, 300–03, 87 S.Ct. 408, 412–14, 17 L.Ed.2d 374 (1966); *Lewis v. United States*, 385 U.S. 206, 209–10, 87 S.Ct. 424, 426–27, 17 L.Ed.2d 312 (1966); *United States v. Hall, supra*, 565 F.2d at 921; *United States v. Bailey*, 5 Cir., 1971, 447 F.2d 735, 737–38. *Compare Gouled v. United States*, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921). It appears further that Juarez was in complete control of his faculties; although he had been in the Ambassador Club, he was not intoxicated, as he himself admits. *Cf. United States v. Watson, supra*, 423 U.S. at 424–25, 96 S.Ct. at 828. *Compare United States v. Hall, supra*, 565 F.2d at 921; *United States v. Elrod*, 5 Cir., 1971, 441 F.2d 353, 356.

■ That Juarez was given *Miranda*[6] warnings and, of greater significance, that he is a member of the State Bar of Texas and a practicing attorney who has represented criminal defendants, are also relevant. Although the prosecution is not required to prove the search victim's knowledge of the right to refuse a request to search in order to establish voluntary consent, it "is a factor to be taken into account." *Schneckloth v. Bustamonte, supra,* 412 U.S. at 249, 93 S.Ct. at 2059. Indeed, that the subject of a search was aware of his right to refuse but consented nonetheless is one of the most probative indicia of voluntariness. As a lawyer schooled in the criminal law, of which fourth amendment jurisprudence is an integral part, Juarez, much more so than a legal layman, surely must have known one can frustrate a consent search by simply objecting, if he so desires. Additionally, Júarez was given his *Miranda* rights, which the record reflects he clearly understood. It is, of course, a rare case that one can prove that an individual affirmatively knew of his right to refuse to be searched, *see Schneckloth v. Bustamonte, supra,* 412 U.S. at 229–30, 93 S.Ct. at 2049, and this case is no exception. Nonetheless, Juarez's legal acumen and the fact that *Miranda* warnings were given and understood remain legitimate considerations in our inquiry. *See United States v. Watson, supra,* 423 U.S. at 424–25, 96 S.Ct. at 828; *Schneckloth v. Bustamonte, supra,* 421 U.S. at 229–30, 93 S.Ct. 2049; *United States v. Legato,* 5 Cir., 480 F.2d 408, 413, *cert. denied,* 414 U.S. 979, 94 S.Ct. 295, 38 L.Ed.2d 223 (1973); *United States v. Canseco,* 5 Cir., 1972, 465 F.2d 383, 385; *Rosenthall v. Henderson,* 5 Cir., 1968, 389 F.2d 514, 516.

These facts—the absence of police intimidation, fraud, or more subtle types of coercion, Juarez's control of his faculties, his legal training, and the fact that he received *Miranda* warnings—all point to the voluntariness of Juarez's consent. When they are considered with his words of acquiescence, the evidence becomes decisive. Un-der all the circumstances, then, we find that Lenin Juarez freely consented to Agent Brazil's search and that the trial court properly admitted the fruits of the search into evidence on this ground.

### B. *Exigent Circumstances*

■ Our second reason for holding that the search passes constitutional muster is the exigent circumstances exception to the fourth amendment warrant requirement. When the police possess probable cause to conduct a search, but, because of exigent circumstances, do not have time to obtain a warrant, they may search without a warrant. *E. g., Roaden v. Kentucky,* 413 U.S. 496, 505, 93 S.Ct. 2796, 2802, 37 L.Ed.2d 757 (1973); *Chambers v. Maroney,* 399 U.S. 42, 46–52, 90 S.Ct. 1975, 1978–82, 26 L.Ed.2d 419 (1970); *United States v. Hand,* 5 Cir., 1975, 516 F.2d 472, 473–76, *cert. denied,* 424 U.S. 953, 96 S.Ct. 1427, 47 L.Ed.2d 359 (1976). Both the Government and Juarez agree that Agent Brazil had probable cause to search Juarez for the marked government funds. *See, e. g., Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *United States v. Nieto,* 5 Cir., 510 F.2d 1118, 1119–20, *cert. denied,* 423 U.S. 854, 96 S.Ct. 101, 46 L.Ed.2d 78 (1975). The parties disagree, however, as to when probable cause was first established and, more fundamentally, as to whether exigent circumstances actually existed.

Juarez contends that the warrantless search of his person was deliberately planned. He asserts that the DEA agents possessed probable cause at the time they decided to set up the Ambassador Club rendezvous between Gerhardt and Juarez, and therefore the agents could and should have secured a warrant to search for the marked government funds, which, according to Juarez, the agents knew would be in his possession. The Government, on the other hand, suggests that probable cause did not exist until Juarez actually accepted the funds; thus, the argument goes, a trip to the magistrate beforehand would have been fruitless. Juarez also avers there was sufficient

6. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

time between Gerhardt's signal to Hernandez that Juarez had the money and Juarez's attempt to leave the Ambassador Club area to obtain a search warrant. The Government disagrees and argues that the fact that Juarez was attempting to leave gave rise to exigent circumstances which, when coupled with the probable cause that accrued upon Gerhardt's signal, rendered the warrantless search legal. Juarez responds that this argument is simply part of the Government's scheme to circumvent the warrant requirement. According to Juarez, the agents must have known he eventually would attempt to leave; consequently, they decided to forego their opportunity to obtain a search warrant, wait for Juarez to attempt to leave, and then search him under the guise of exigent circumstances. The exigent circumstances, therefore, were "pre-planned," and the search was a "planned, warrantless search," [7] Juarez argues.

■ The district court correctly ruled that the agents could not have obtained a search warrant before the Ambassador Club meeting, because probable cause did not then exist. Probable cause to search Juarez for the marked government funds, by definition, means probable cause to believe Juarez actually possessed the funds, and the agents were not sure of Juarez's possession until Gerhardt signaled Agent Hernandez. Simply because the agents knew beforehand the funds were to exchange hands does not mean they knew the funds actually would exchange hands. Juarez, for example, could have sensed danger and refused to accept the payment, a possibility that hardly seems incredulous in light of the fact that he already was suspicious that the

authorities knew of his crimes.[8] *See United States v. Gardner,* 5 Cir., 1977, 553 F.2d 946, 948, *cert. denied,* —— U.S. ——, 98 S.Ct. 722, 54 L.Ed.2d 753 (1978).

■ We also agree with the trial court that there was insufficient time after Gerhardt's signal to Hernandez that the money had been paid to obtain a search warrant. Gerhardt signaled at approximately 10:30 p. m., Juarez left the club at approximately 11:00 p. m., and then began walking toward his car at approximately 11:15 p. m. A mere forty-five minutes thus passed between the establishment of probable cause and Juarez's attempt to leave the scene. The agents could not have obtained a search warrant in such a short period of time, and had they attempted to do so, their suspect would have driven away and the government funds likely would have been lost. Additionally, the possibility existed that the defendant would dispose of the money even before he could flee with it. Juarez himself testified he passed the funds to his friend Art Chavez shortly after leaving the club. But for the happenstance that a young woman's appearance distracted Chavez, causing him to return the money to Juarez and reenter the club, the funds might then and there have escaped recovery. It is not surprising, then, that in the face of such exigent circumstances, and armed already with probable cause, the agents chose to detain briefly Lenin Juarez so that Agent Brazil could search for the money and recover it. Such police action in a "'now or never'" situation, *Roaden v. Kentucky, supra,* 413 U.S. at 505, 93 S.Ct. at 2802, does not violate the fourth amendment's proscription of unreasonable searches and seizures. We agree with the

7. We note that defendant relies on *United States v. Mitchell,* 5 Cir., 1976, 538 F.2d 1230 *(en banc), cert. denied,* 430 U.S. 945, 97 S.Ct. 1578, 51 L.Ed.2d 792 (1977), for support in describing the situation in this case as a "planned, warrantless search." In *Mitchell,* which also was an exigent circumstances case, the defendant relied on *Coolidge v. New Hampshire,* 403 U.S. 443, 471 n.27, 91 S.Ct. 2022, 2041 n.27, 29 L.Ed.2d 564 n.27 (1971), on which Juarez also relies, for support in attempting to invalidate the DEA agents' actions as a

"planned warrantless seizure" [emphasis in original]. A majority of the members of this Court pointed out that such reliance was misplaced, because in *Coolidge* the Supreme Court used the expression "*planned* warrantless seizure" in speaking of the inadvertence element of the plain view doctrine, not in speaking of the exigent circumstances exception. 538 F.2d at 1233 n.3.

8. See note 2 *supra.*

trial court that the search was legal under the exigent circumstances exception to the fourth amendment warrant requirement. *United States v. Gardner, supra; United States v. De La Fuente,* 5 Cir., 1977, 548 F.2d 528, 538–40; *United States v. Mitchell, supra,* 538 F.2d at 1233–34; *United States v. Hand, supra,* 516 F.2d at 473–76.

## III. *The Tape Recordings*

Defendants Lenin and Oscar Juarez next contend that the trial court committed reversible error in admitting into evidence the two tape recordings of conversations between Joe Miguel Gerhardt and Lenin Juarez. The first recording was of the September 23, 1976 telephone conversation between Gerhardt and Lenin Juarez and the second recording was of the September 27, 1976 conversation between the two which transpired during a meeting at Lenin Juarez's home. Both conversations were highly incriminatory of both Lenin and Oscar Juarez, who now challenge their admissibility in taped form on the grounds that the recordings were communications between an attorney and his client and therefore protected by the attorney-client privilege, that the recordings were nonconsensual and therefore taken in violation of 18 U.S.C. § 2511(2)(c) and 47 U.S.C. § 605, and that the recordings were inaudible and unintelligible and therefore unreliable. Oscar Juarez may challenge the tapes' admissibility on the third ground only; he lacks standing to complain on the first ground because he was in no way a part of the alleged attorney-client relationship, *see* McCormick on Evidence §§ 88–89 (2d ed. E. Cleary ed. 1972), as well as on the second ground because he has "no legitimate expectation of privacy either through participation in the conversation or through a possessory interest in the tapes," *United States v. Ransom,* 5 Cir., 1975, 515 F.2d 885, 889, *cert. denied,* 424 U.S. 944, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976).

Lenin Juarez asserts that Gerhardt had retained him to represent his family in a civil rights action against a local sheriff's department. See note 5 *supra.* Assuming for a moment this is true, which Gerhardt denies, and assuming further that the conversations between Juarez and Gerhardt actually pertained to Juarez's alleged legal representation, *see McCormick on Evidence, supra,* § 88 at 179–80, which we question, the admission of the taped recordings did not violate the attorney-client privilege because Gerhardt, as the alleged client, waived the privilege by not raising it at trial, an omission that is not surprising considering he was a government informant. *E. g., United States v. Gurtner,* 9 Cir., 1973, 474 F.2d 297, 299; *McCormick on Evidence, supra,* § 93 at 194.[9] Juarez concedes as much but points to Justice White's statement in his opinion for the Supreme Court in *Fisher v. United States,* 425 U.S. 391, 402 n.8, 96 S.Ct. 1569, 1576 n.8, 48 L.Ed.2d 39 n.8 (1976), that "it is universally accepted that the attorney-client privilege may be raised by the attorney" as support for the proposition that he, Juarez, could assert the privilege in spite of Gerhardt's waiver. Defendant's reliance is misplaced. The language in *Fisher,* read in its proper context in that opinion, indicates only that if the client is unable to raise the privilege in a particular case because he is not a party, the attorney may assert the privilege *for the client.* This postulate follows naturally from the bedrock principle that the attorney-client privilege is the client's and his alone. If the client wishes to waive it, the attorney may not assert it, either for the client's or for his own benefit. *E. g., Republic Gear Co. v. Borg-Warner Corp.,* 2 Cir., 1967, 381 F.2d 551, 556; *McCormick on Evidence, supra,* § 92 at 192. Lenin Juarez's contention that the admission of the tapes violated the attorney-client privilege is therefore without merit.

Juarez's second ground for challenging the trial court's evidentiary ruling is also without merit. Defendant asserts that the

---

**9.** Fed.R.Evid. 501 provides with respect to privileges that the federal courts "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

DEA agents taped the conversations with neither his nor Gerhardt's consent, and thus violated 18 U.S.C. § 2511(2)(c) and 47 U.S.C. § 605.[10]

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, governs law enforcement officers in this regard. 18 U.S.C. § 2511(2)(c) provides:

It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.[11]

Both parties concede that Lenin Juarez did not consent to the taping of the conversations. Juarez contends that Gerhardt also did not consent, at least not voluntarily, "because of an expressed and/or implied promise of immunity and leniency" by the

**10.** 47 U.S.C. § 605 provides:

Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is broadcast or transmitted by amateurs or others for the use of the general public, or which relates to ships in distress. Section 605 has no relevance to this case because Congress intended law enforcement personnel to be governed exclusively by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20. *United States v. Hall,* 9 Cir., 1973, 488 F.2d 193, 195–96.

**11.** 18 U.S.C. § 2515 provides:

Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

18 U.S.C. § 2518(10)(a) provides further:

Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—

(i) the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval.

Such motion shall be made before the trial, hearing, or proceeding unless there was no opportunity to make such motion or the person was not aware of the grounds of the motion. If the motion is granted, the contents of the intercepted wire or oral communication, or evidence derived therefrom, shall be treated as having been obtained in violation of this chapter. The judge, upon the filing of such motion by the aggrieved person, may in his discretion make available to the aggrieved person or his counsel for inspection such portions of the intercepted communication or evidence derived therefrom as the judge determines to be in the interests of justice.

Government, which, according to Juarez, Gerhardt feared he would lose if he did not agree to the taping.

 For a party's consent to be valid under 18 U.S.C. § 2511(2)(c), it must be voluntary and uncoerced. *United States v. Osser,* 3 Cir., 483 F.2d 727, 730, *cert. denied,* 414 U.S. 1028, 94 S.Ct. 457, 38 L.Ed.2d 321 (1973). We find that Gerhardt's consent meets these standards. It is true the Government has not yet chosen to prosecute Gerhardt, and in soliciting his assistance Agent Hernandez promised to make known his cooperation to the prosecutor and to his sentencing judge, as well as to provide financial assistance if threats forced him and his family to relocate. In this regard Gerhardt has received $1,100 from the Government. One could thus infer that Gerhardt hoped by cooperating with the Government to receive these benefits, and possibly escape prosecution altogether. These circumstances do not render his consent to the taping involuntary, because raised expectations and hopes, at least in this case, do not by themselves amount to coercion. Indeed, "[o]ur inquiry on appeal is limited to whether the consent was voluntary and uncoerced, not whether the motivations for it were altruistic or self-seeking." *United States v. Osser, supra,* 483 F.2d at 730. Finding no evidence in the record of undue pressure, threats, or improper inducement by the Government, we determine that Gerhardt's consent to the taping was voluntary. *See United States v. Osser, supra,* 483 F.2d at 730; *United States v. Slawik,* D.Del., 1976, 408 F.Supp. 190, 219–20, *rev'd on other grounds,* 3 Cir., 1977, 548 F.2d 75. *Cf. Bordenkircher v. Hayes,* —— U.S. ——, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978).

 The third objection to the admission of the tapes is that they were inaudible and unintelligible and therefore unreliable. In *United States v. Avila,* 5 Cir., 443 F.2d 792, 795–96, *cert. denied,* 404 U.S. 944, 92 S.Ct. 295, 30 L.Ed.2d 258 (1971), a panel of this Court stated with respect to a similar assertion in that case:

Additionally it is argued that the tapes should have been excluded because they were in a foreign language and were inaudible in many places. We also reject this argument. This Circuit has held that tape recordings which are partially inaudible are not inadmissible per se unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy. This determination is left to the sound discretion of the trial judge. *Addison v. United States,* 317 F.2d 808, 815 (5th Cir. 1963). In the instant case there was ample basis for the trial court's determination that the tapes and the translated transcripts were an accurate reproduction of the conversation they purported to reproduce. This basis is of course bolstered by the fact that the person who carried the recording device appeared as a witness in the trial and was subject to cross-examination.

The district court in the case at bar held an extensive hearing on defendants' contentions before admitting the tapes. Here, as in *Avila,* there is "ample basis" for the trial court's determination that the tapes were reliable, a basis which, as in *Avila,* is further supported by the fact that Gerhardt appeared as a witness and subjected himself to cross-examination.

### IV. *Other Contentions*

 The defendants raise nine other points of error. They assert that the trial court erred in denying their motion for a mistrial because Count One of the indictment charged them with conspiring with intent to distribute five ounces of heroin, while testimony at trial allegedly indicated that less than one ounce of heroin was involved. The contention is without merit. First, there was no variance. The government chemist testified at trial that the five ounces of heroin in question were comprised of 23.63 grams of pure heroin mixed with heroin hydrochloride salt. Though not pure heroin, the five ounces were still heroin. Second, even if a variance existed, not every variance between the indictment and the proof is fatal. A fatal variance is one which affects " 'the substantial rights' of the accused," either by insufficiently informing him of the charges against him

such that he is taken by surprise and prevented from presenting a proper defense, or by affording him insufficient protection against reprosecution for the same offense. *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935). *See United States v. Lambert,* 5 Cir., 1974, 501 F.2d 943, 947–48 (*en banc*). The defendants in this case have failed to demonstrate satisfactorily how the alleged variance affected any of their " 'substantial rights.' " *Compare United States v. Lambert, supra,* 501 F.2d at 947–48. Third, in prosecutions for conspiracy under 21 U.S.C. § 846, the Government need not allege or prove at trial an overt act. *United States v. Palacios,* 5 Cir., 1977, 556 F.2d 1359, 1364 n.9.

■ Defendants allege that the trial court erred in failing to grant their motion for a mistrial because the Government could not produce Agent Hernandez's original notes on the investigation, which he destroyed after writing his reports. According to defendants, the Government's inability to produce the notes was a violation of the Jencks Act, 18 U.S.C. § 3500.[12] A panel of this Court recently considered and rejected this contention in *United States v. Martin,* 5 Cir., 1978, 565 F.2d 362.

■ The Juarez brothers next contend the trial court erred in not granting their motion for a mistrial because, while cross-examining a character witness for Lenin Juarez, the Assistant United States Attorney asked a question that allegedly implied there was some impropriety on the part of an attorney representing persons accused of narcotics violations.[13] Counsel for defendants objected to the question but the trial court overruled the objection. The court shortly thereafter changed its ruling, struck the testimony from the record, and instructed the jury to disregard it. Defendants suggest they were nonetheless denied their sixth amendment right to effective assistance of counsel because their attorneys were held up "to ridicule and scorn before the jury," which allegedly prejudiced the jury against them and their clients. The contention is meritless. Assuming for the sake of argument that the question was improper, the trial court's prompt instruction removed any prejudice. *United States v. Leaman,* 5 Cir., 546 F.2d 148, 150–51,

12. The Jencks Act provides in pertinent part:
(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.
(d) If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.
18 U.S.C. § 3500(b), (d).

13. The prosecutor asked the following questions of the witness, the Dean of the Texas Tech School of Law:
Q. You have never practiced criminal law in Texas, have you?

A. No. I have been involved in a couple of criminal cases at the request of individuals, yes.
Q. Have you represented any dope pushers in Texas?
A. No, I wouldn't say, not that I am aware.
Q. Do you—
MR. GILKERSON: If it please the Court, we object to this question for the reason that it is an attempt on the part of the prosecutor to bring some inference that there is something wrong with some lawyer who would represent somebody who has been accused of narcotic violations.
MR. SPECK: Nothing of the sort, Your Honor, I think my question will become clear once—
THE COURT: Overruled.
Q. Now, then, do you known, personally, any Lubbock dope pushers that you visit with and know to be dope pushers?
A. No.
Q. All right. So if you don't know any dope pushers in Lubbock, you don't represent any dope pushers in Lubbock then, I take it, then, you have not discussed the reputation of Lenin Juarez with any dope pushers, is that correct?
A. None that I know of.

*cert. denied,* 431 U.S. 917, 97 S.Ct. 2180, 53 L.Ed.2d 227 (1977).

■ Defendants' contention that the trial court committed reversible error by limiting their cross-examination of Gerhardt is equally erroneous. The trial court sustained the Government's objection to certain of defendants' questions regarding, for example, the status of Gerhardt's health and whether he received food stamps, because they were irrelevant. Defendants assert that the questions were relevant to Gerhardt's character and credibility. After reviewing the record, where we observe over 150 pages devoted to the cross- and recross-examination of Gerhardt, we find no abuse in this instance of the trial court's considerable discretion in determining the scope of cross-examination. *E. g., United States v. Markham,* 5 Cir., 1976, 537 F.2d 187, 195–96, *cert. denied,* 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977).

■ As their next point of error defendants contend the district court erred in denying their motion to transfer the case from the Western District of Texas, Pecos Division, to the Northern District of Texas, Lubbock Division, pursuant to Fed.R.Crim.P. 21(b).[14] A motion for a change of venue "is addressed to the discretion of the trial court and in the absence of an abuse of that discretion, the trial decision will not be overturned on appeal." *United States v. Thaggard,* 5 Cir., 477 F.2d 626, 630, *cert. denied,* 414 U.S. 1064, 94 S.Ct. 570, 38 L.Ed.2d 469 (1973). Defendants' primary complaint in this regard seems only that a more lenient jury could have been empaneled in the Northern District, an objection that falls far short of supporting a finding of abuse of discretion by the district court.

■ Defendants also assert they were improperly and prejudicially joined, and that the trial court should have granted their motion for a severance and separate trials. In light of Fed.R.Crim.P. 8(b), which provides for the joinder of defendants when "they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses," we cannot say the Juarezes' joinder was improper. *See United States v. Johnston,* 5 Cir., 547 F.2d 282, 284, *cert. denied,* 431 U.S. 942, 97 S.Ct. 2660, 53 L.Ed.2d 261 (1977) (joinder under Rule 8 is permissible when defendants are properly charged with a single conspiracy). Neither was their joinder prejudicial. The district court did not abuse its discretion in denying defendants' motion for a severance and separate trials pursuant to Fed.R.Crim.P. 14, *see United States v. Nims,* 5 Cir., 524 F.2d 123, 125, *cert. denied,* 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976), because Rule 14 requires a showing of prejudice, which defendants have not satisfactorily made.[15] *See United States v. Wasson,* 5 Cir., 1978, 568 F.2d 1214 at 1221–1224; *United States v. Bynum,* 5 Cir., 1978, 566 F.2d 914, 919–21, 928–29; *United States v. Strand,* 5 Cir., 1975, 517 F.2d 711, 714. Moreover, the trial court gave appropriate jury instructions designed to prevent any prejudice or confusion that might result from trying the Juarez brothers together.

■ Defendants make two other contentions, neither of which require reversal. Defendants aver there is insufficient evidence to support their conviction under Count Two of the indictment, which charged Oscar Juarez with distributing heroin and Lenin Juarez with aiding and abet-

**14.** Fed.R.Crim.P. 21(b) provides:

*Transfer in Other Cases.* For the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to him or any one or more of the counts thereof to another district.

**15.** Fed.R.Crim.P. 14 provides:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

ting the distribution of heroin. Because the trial court imposed concurrent sentences on the six counts of which defendants were convicted, the sufficiency of the evidence on Count Two is a moot question if the evidence is sufficient to sustain any one of the other counts. *E. g., United States v. Beasley,* 5 Cir., 550 F.2d 261, 270, *cert. denied,* 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977). Examining the evidence in the light most favorable to the Government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), it is apparent from the many incriminatory facts mentioned already in our opinion that the evidence is sufficient to sustain the convictions on any and all counts.

■ Finally, the Juarez brothers charge they were denied their sixth amendment right to a public trial when the district court refused to allow their witnesses to be present in the courtroom for the closing arguments and the jury charge. This is not so. Fed.R.Evid. 615 provides that, at the request of a party or of its own motion, "the court shall order witnesses excluded so they cannot hear the testimony of other witnesses." Because closing arguments of counsel often restate witness testimony, the trial court could justifiably fear that witnesses present at such arguments might learn the testimony of other witnesses, thus jeopardizing the fairness of a second trial should one be necessary. "The constitutional right to a public trial is not a limitless imperative," we have said. *Lacaze v. United States,* 5 Cir., 1968, 391 F.2d 516, 521. The district court's restriction on access to the courtroom was reasonable and well within the requirements of the sixth amendment. *See Aaron v. Capps,* 5 Cir., 1975, 507 F.2d 685, 687–88.

The convictions of Lenin Juarez and Oscar Juarez are

AFFIRMED.